Larry BLALOCK, Plaintiff-Appellant,

v.

METALS TRADES, INC., Defendant-Appellee.

No. 84–3714.

United States Court of Appeals, Sixth Circuit.

Argued July 18, 1985.

Decided Oct. 24, 1985.

Alexander M. Spater (argued), Lead Counsel, Michael S. Kolman, Spater, Gittes, & Terzian, Columbus, Ohio, for plaintiff-appellant.

Lloyd C. Nicol (argued), Circleville, Ohio, for defendant-appellee.

Before CONTIE, WELLFORD and MILBURN, Circuit Judges.

CONTIE, Circuit Judge.

Larry Blalock appeals the district court's judgment in favor of the defendant, Metals Trades, Inc. on Blalock's complaint alleging that Metals Trades discharged him on account of religious discrimination in violation of Title VII, 42 U.S.C. § 2000 *et seq.* For the reasons that follow, we reverse the judgment and remand the case to the district court for proceedings consistent with this opinion.

## I.

Metals Trades is a closely held corporation principally owned by Wendall Woodward and Arnold Brewer. Woodward and Brewer each own 50 of the 101 shares of stock. The remaining share is owned by Woodward's brother, Evan. Wendall Woodward and Arnold Brewer jointly manage the business. Major decisions are made only after the two have reached an agreement. One area of sufficient importance to be subject to joint control is the hiring and firing of office personnel.

Woodward met Blalock through John Rothacker, a self-described "apostle." Rothacker testified that his mission as an apostle is to "establish the church" and to "establish Christians in the foundations of the faith as it is properly presented from the scriptures and the prophets and the apostles that wrote in the New Testament as well as the prophets of the Old." Woodward described Rothacker as his spiritual shepherd, but consistently maintained that although Rothacker "can give me advice . . . it's up to me to make up my mind how I have to handle it myself." Similarly, Rothacker testified that although "in spiritual matters" Woodward was "in submission" to Rothacker, he only offers advice in other areas and "the decisions ultimately reside with him [Woodward]." At the time of the events in question, Rothacker and Woodward regularly met in a prayer group. Members of the group introduced their personal problems to the group's discussion and prayers.

Blalock met Rothacker in 1972 or 1973 and became interested in his work.[1] Rothacker knew that Blalock had an engineering background and that he was interested in sales. In early 1974, Rothacker learned that Woodward was looking for a salesman with some engineering experience. Following a prayer meeting, Rothacker introduced Blalock and Woodward and suggested to Woodward that Blalock might fulfill his needs. In March 1974, Woodward hired Blalock.

It is undisputed that when Blalock began working for Metals Trades, he was told it was a "christian company."[2] Blalock assumed this meant that the company conducted its business with ethical standards consistent with biblical commands. Blalock did not believe that there were any specific religious requirements attendant to the job and Woodward testified that there were, in fact, no religious requirements. At the time, Blalock was eager to work for a christian company and requested and received permission to "witness" his faith to clients who expressed an interest in religious matters. Woodward was happy to have "a Christian, a good, moral, ethical man" working for Metals Trades.

---

1. Rothacker testified that Blalock had sought training from him in the method of his ministry. Blalock testified that he only wanted to "observe" Rothacker. "He made some big claims for himself. I wanted to check them out."

2. Although Metals Trades is described as a "christian company," Metals Trades does not contend that this action is barred by statutory, 42 U.S.C. § 2000e–1, or constitutional limitations, *Dayton Christian Schools, Inc. v. Ohio Civil Rights Commission,* 766 F.2d 932 (6th Cir. 1985).

Soon after Blalock started working at Metals Trades, he and Rothacker had a parting of the ways. The basis of their disagreement is undisputed. Blalock felt that Rothacker wanted him to submit to his authority, which he was unwilling to do. Rothacker, being an apostle, felt Blalock owed him a certain amount of obedience, which was not forthcoming. Blalock testified that during work hours Woodward relayed acrimonious messages and accusations from Rothacker to him. According to Blalock, Woodward also quoted bible verses to him, arguing that he was in doctrinal error in parting with Rothacker. Woodward acknowledged that he may have passed on some information from Rothacker to Blalock, but he could not remember the content.

Arnold Brewer testified that he became disenchanted with Blalock soon after he started working at Metals Trades and Woodward confirmed Brewer's testimony. Woodward testified that he asked Brewer to give Blalock some more time. Brewer's specific complaints against Blalock were a perceived patronizing attitude, a habit of spending too much time agonizing over insignificant mechanical tolerances, leaving a mess on Brewer's desk and failing to call in to tell Metals Trades when he would be working.[3] Blalock testified, on the other hand, that Brewer asked him only two weeks before his discharge if he would consider working full time.

Blalock was fired in September 1974. Brewer had been unhappy with Blalock for some time and when Woodward reached a decision to fire Blalock, Brewer readily assented. Blalock and Woodward's versions of the actual firing are generally consistent. Woodward told Blalock he wanted to talk to him. Blalock asked if it concerned Rothacker and Woodward responded that it did. Blalock said he did not want to discuss it if it concerned Rothacker. According to Woodward, Blalock immediately left the room. Woodward admitted that he told Blalock "until he got things straightened with John [Rothacker], he was discharged." According to Blalock, he did not leave immediately, but instead stated that while he would discuss work matters, he would not talk about Rothacker. Blalock testified that although Woodward agreed to talk about work only, he never mentioned any work-related problems, but instead kept referring back to the biblical reference to "feigned obedience." After this went on for some time, according to Blalock, he told Woodward he was leaving. Blalock testified that at that point Woodward said, "consider yourself laid off ... until the situation with you and John Rothacker is settled." Woodward testified, however, that his statement about Rothacker was "simply my reaction to his reaction" and that he never meant to condition employment on Blalock's relationship with Rothacker. Blalock subsequently telephoned Woodward in an attempt to recover his job. Blalock testified that he asked Woodward to talk only about their business relationship and leave religion out of it, but that Woodward refused to do so. Woodward's testimony was entirely consistent with this account.

Two letters from Woodward to the Ohio Civil Rights Commission were introduced into evidence. In the first, Woodward stated that "we were generally satisfied" with Blalock's performance of his sales duties. The letter expressed some displeasure, however, with Blalock's attitude and his engineering practices. A second letter states that Blalock was laid off because of the failure to notify Woodward which days he would be working and because Woodward asked him "a question and he refused to answer." Woodward testified that this referred to Blalock's refusal to discuss Rothacker when he was discharged. The letter then states:

> Larry was hired with the full knowledge and understanding that Metals Trades is a Christian Company and our rule book is

---

**3.** Blalock arranged to work three days out of each week. He was to tell Metals Trades which three days of the week he planned to work.

the word of God, or the Bible. He was in full accord and very excited. He said he wanted to work for a Christian Company and, being a salesman contacting new accounts, he wanted to witness to them; in which I encouraged him. Larry is a fine young man and he has my respect in many areas. I hated to lay him off as there are all too few men willing to commit themselves to Jesus—especially salesmen. Larry's problem is that he refuses to submit himself to those in authority over him and the Bible makes it clear that we are to be in submission. Larry was let go for strictly secular reasons but the root of his problem is spiritual, as the scriptures will show....

The letter closed by quoting several biblical passages.

The district court accepted Blalock's contention that the precise analysis of *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) does not apply in this case. "[T]his is a case in which the plaintiff has offered direct evidence that defendant intentionally discriminated against him." The court did "not agree, however, with plaintiff's assertion that he has proved his case by direct evidence that the defendant discharged him because of religious differences." The court found that

[t]he personal relationship between plaintiff and Mr. Woodward that motivated Mr. Woodward to tolerate plaintiff's poor performance as an employee was rooted in their shared religious experience. When this personal relationship broke down, Mr. Woodward no longer felt motivated to close his eyes to plaintiff's attitudes and behavior as an employee.

The court held that "plaintiff has not proved that defendant fired him because of his religion or because of any particular religious beliefs he may have held" and that "there was no discriminatory intent in violation of Title VII." Further, "plaintiff has failed to prove that in terminating him, defendant intentionally discriminated

against plaintiff because of his religion or religious beliefs." On appeal, Blalock contends first that the district court clearly erred in finding that Blalock had not established by direct evidence that Metals Trades acted with discriminatory intent, and, second, that, in light of its clearly erroneous findings, the district court erred in apportioning the burden of proof with respect to establishing the "cause" of Blalock's termination.

## II.

Preliminarily, we note that we review the district court's findings of fact for clear error. *Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 374 (6th Cir.1984); *Geisler v. Folsom,* 735 F.2d 991, 995 (6th Cir. 1984); *Sones-Morgan v. Hertz Corp.,* 725 F.2d 1070, 1071 (6th Cir.1984); *Fields v. Bolger,* 723 F.2d 1216, 1219 (6th Cir.1984). There are no distinctions between ultimate and subsidiary findings of fact, the predominant issue of intent in Title VII cases is factual, and the deferential standard of Fed.R.Civ.Pro. 52 does not apply to questions of law. *Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). In *Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), the Court reiterated that a reviewing court may only overturn the district court's findings when the court "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "The reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court." *Anderson,* 105 S.Ct. at 1511.

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

*Id.* at 1512. Further, "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52 demands

even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.*

Prerequisite to examination of the district court's factual findings is a review of the legal standards applicable to this case. Two factors influence our determination of these standards: first, that plaintiff attempted to prove his case of discrimination by direct evidence, and, second, that the evidence suggests the possibility of dual motives for the discharge.

### A.

■ First, we note, in agreement with the district court, that the *McDonnell Douglas* test and its shifting burdens are "inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston,* —— U.S. ——, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985), citing *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977) ("the *McDonnell Douglas* formula does not require direct proof of

discrimination"); [4] *Thompkins v. Morris Brown College,* 752 F.2d 558, 563 (11th Cir.1985); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 875–76 (11th Cir.1985); *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984) (*McDonnell Douglas* "is not intended to be a Procrustean bed within which all disparate treatment cases must be forced to lie."); *Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1143 (11th Cir.1983); *Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir.1982). Direct evidence and the *McDonnell Douglas* formulation are simply different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent. But see *Zebedeo v. Martin E. Segal Co.,* 582 F.Supp. 1394, 1412 n. 7 (D.Conn.1984). "Where the evidence for a prima facie case consists ... of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the prima facie evidence the ultimate issue of discrimination is proved; no inference is required." *Lee,* 684 F.2d at 774; *Miles,* 750 F.2d at 875–76; *Perryman,* 698 F.2d at 1143.[5]

---

4. It has, of course, long been recognized that the decision in *McDonnell Douglas* "did not purport to create an inflexible formulation." *Teamsters,* 431 U.S. at 358, 97 S.Ct. at 1866; *Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6; *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 575, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *McDonnell Douglas Corp.,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. The *McDonnell Douglas/Burdine* allocation of the presentation of evidence provides:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093 (citations omitted). To establish a prima facie case, plaintiff must show:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted).

5. This distinction between direct and circumstantial evidence raises the issue of what constitutes "direct" evidence. *Dybczak v. Tuskegee Institute,* 737 F.2d 1524, 1528 (11th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1180, 84 L.Ed.2d 328 (1985) (statistics are not direct evidence); *Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64, 69 n. 6 (1st Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984) (statistical evidence is circumstantial); *Clay v. Hyatt Regency Hotel,* 724 F.2d 721, 724 (8th Cir.1984).

Of course, a plaintiff has no stake in characterizing his evidence as either circumstantial or direct, since our holding in Part B, *infra,* regarding the burden of proof, has been construed by other courts as applicable regardless of whether the evidence is circumstantial or direct. *Lee,*

"When direct evidence of discrimination has been introduced, the lower court must, as an initial matter, specifically state whether or not it believes plaintiff's proffered direct evidence of discrimination." *Thompkins*, 752 F.2d at 564. The district court found that "there was no discriminatory intent in violation of Title VII." [6] Recognizing our deferential standard of review, we respectfully disagree with this conclusion of the district court. This conclusion draws on other findings of fact made by the district court. The district court made a crucial finding, adequately supported by the record, which indicates that discrimination was at least a factor in Blalock's discharge. The district court held:

> The shared beliefs of plaintiff and Mr. Woodward was an aspect of their personal relationship with one another. In fact, it was in part because of this shared experience that *Mr. Woodward tolerated conduct and attitudes on the part of plaintiff that he may not have tolerated with any employee with whom he did not share such a personal relationship.*
>
> The personal relationship between plaintiff and Mr. Woodward that motivated Mr. Woodward to tolerate plaintiff's poor performance as an employee was rooted in their shared religious experience. *When this personal relationship broke down, Mr. Woodward no longer felt motivated to close his eyes to plaintiff's attitudes and behavior as an employee.* It was at this point that Mr. Woodward decided to capitulate to Mr. Brewer's position that plaintiff should be asked to leave their company....
>
> It is clear that Messrs. Woodward and Blalock voluntarily spun an entangled web of work, religion and personal relationships. It is not, therefore, surprising that a break in their religious ties caused the entire web, including their once positive relationship, to collapse. *Plaintiff could then no longer rely upon Mr. Woodward's enhanced tolerance to save his job.* Regardless of the fact that religion was an important aspect of the personal relationship between plaintiff and Mr. Woodward, plaintiff has not proved that defendant fired him because of his religion or because of any particular religious beliefs he may have held.

(emphasis added).

The district court adequately captured the situation that existed at Metals Trades, but simply drew the wrong conclusion as to the effect of the situation. It is no doubt true that "Woodward tolerated conduct and attitudes on the part of plaintiff that he may not have tolerated with an employee with whom he did not share such a personal relationship," and that it was only when "this relationship broke down [that] Woodward no longer felt motivated to close his eyes to plaintiff's attitudes and behavior." These findings, however, reveal that religion played a role in Blalock's discharge. The district court found that Woodward treated Blalock differently at different times depending upon Blalock's current religious views. This is the essence of discrimination. Woodward was willing to give special consideration to those persons who shared his religious views, but, when Blalock's religious views changed, Woodward no longer gave Blalock this special consideration.

In addition to the district court's own findings, other evidence in the record reveals that religious discrimination played at least a role in the employment decision. Blalock was not actually fired until he refused to discuss Rothacker. In a letter to the Ohio Civil Rights Commission, Woodward asserted that one reason for the discharge was Blalock's refusal to answer a

684 F.2d at 774. However the evidence is characterized, the *McDonnell Douglas* formulation is applicable when it is helpful in resolving the ultimate issue of intentional discrimination.

**6.** We recognize that this statement could be construed as a conclusion that, even though there may have been some discriminatory intent, that intent did not cause the discharge, and, therefore, was not in violation of Title VII. Even if the district court so concluded, remand for consideration of the evidence in light of the burden of proof set out in Part B, *infra,* is required.

question. Woodward testified, however, that this referred to Blalock's refusal to discuss his situation with Rothacker. Woodward admitted telling Blalock that he should consider himself discharged until he reconciled himself with Rothacker. When Blalock attempted to regain his job, Woodward refused to discuss the matter separately from religion. All of these factors make it very clear that Blalock's change in his religious views was at least a factor in the discharge.

The district court may have been lead astray by the fact that Woodward and Brewer found Blalock's work performance problematic at the time of discharge. There is certainly sufficient evidence in the record to support the conclusion that at the time of discharge Blalock was not meeting the level of work performance then expected of him. The problem is that this same level of performance was acceptable to Metals Trades until Blalock's and Woodward's religious differences became exacerbated. When an employer expresses an enhanced tolerance of an employee's performance because of his religion, but lowers its level of tolerance when the employee's previously agreeable religious views change, the employer has engaged in intentional differential treatment based on religion.[7]

**B.**

The district court's opinion fails to articulate the standard of causation required of Blalock, perhaps because of its conclusion that no discriminatory intent was implicated in the case. The Court has not held

"that the Title VII plaintiff must show that he would have in any event been rejected or discharged solely on the basis of his race, without regard to the alleged deficiencies; ... no more is required to be shown than that race was a 'but for' cause." *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976); *Bibbs v. Block,* 749 F.2d 508, 511 (8th Cir.1984) (reh'g en banc granted, March 8, 1985); *Jack v. Texaco Research Center,* 743 F.2d 1129, 1131 (5th Cir.1984); *Lewis v. University of Pittsburgh,* 725 F.2d 910, 915 (3d Cir.1983), *cert. denied,* — U.S. ——, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984); *Sumler v. City of Winston-Salem,* 448 F.Supp. 519, 528 (M.D.N.C.1978). This "but for" causation is satisfied when the plaintiff establishes that the defendant's discriminatory intent more likely than not was the basis of the adverse employment action. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Furnco,* 438 U.S. at 577, 98 S.Ct. at 2949; *Bibbs,* 749 F.2d at 511. The Court, however, has not expressly explained causation requirements in a Title VII dual motive case.[8]

Blalock contends that the district court should have applied the causation analysis of *Mt. Healthy School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a case in which the plaintiff alleged that he was terminated due to exercise of his First Amendment rights.

A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an em-

---

**7.** If it seems harsh to conclude that an employer discriminates by evaluating an employee under normal standards when the employer had previously evaluated the employee under more lenient standards, it should be pointed out that Metals Trades created a high potential for discrimination when it hired Blalock. That is, from what appears in the record, Woodward never had a great need for an employee with Blalock's background and it seems doubtful the Blalock ever would have been hired had he been, for example, a Moslem. Similarly, during the initial phase of Blalock's tenure at Metals Trades, other employees who did not share Woodward's religious views were apparently

held to a higher standard of performance. Had one of them been discharged for misconduct of a severity comparable to that engaged in by Blalock, he or she would have had a potential claim of religious discrimination.

**8.** The *McDonnell Douglas* test, while considering other reasons for the discharge as articulated by the defendant, is designed to ascertain the "true" reason for the discharge. "In a mixed-motive context such as this, the challenged employment decision presumably was motivated by *both* pretextual (unlawful) and nonpretextual (lawful) reasons." *Bibbs,* 749 F.2d at 511 n. 1.

ployee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing.... The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

429 U.S. at 285–86, 97 S.Ct. at 575. Further,

the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"—or to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

*Id.* at 287, 97 S.Ct. at 576 (footnote omitted); *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 416–17, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979). The Court has applied this causation standard

(sometimes called the "same decision" test) to Fourteenth Amendment claims, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 566 n. 21, 50 L.Ed.2d 450 (1977),[9] and more recently, to unfair labor practices, *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 399–400, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667 (1983).[10] In *Transportation Management,* the Court explained that "[t]he employer is a wrongdoer; he has acted out of a motive that is declared illegitimate by the statute. It is fair that he bear the risk that the influence of legal and illegal motives cannot be separated, because he knowingly created the risk and because the risk was created not by innocent activity but by his own wrongdoing." *Id.* at 403, 103 S.Ct. at 2475. Further, we have applied the *Mt. Healthy* standard to an action under the Federal Coal Mine Health and Safety Act of 1969 after initially applying the *Burdine* test. *Boich v. Federal Mine Safety & Health Review Commission*, 704 F.2d 275, *vacated,* 719 F.2d 194 (6th Cir.1983).

The Court has implicitly, at least, approved application of the *Mt. Healthy* standards in Title VII cases. In *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), the Court, citing *Mt. Healthy,* held that "[e]ven assuming, *arguendo,* that the company's failure even to consider the applications was discriminatory, the company was entitled to prove at trial that the respondents [plaintiffs] had not been injured because they were not qualified and would not have been hired in any event." *Id.* at 403 n. 9, 97 S.Ct. at 1897 n. 9. *See Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251, 262

---

9. Proof that discriminatory purpose in part motivated the decision would

> have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision.

*Village of Arlington Heights,* 429 U.S. at 270 n. 21, 97 S.Ct. at 566 n. 21. *See also Hunter v. Underwood,* —— U.S. ——, 105 S.Ct. 1916, 1920, 85 L.Ed.2d 222 (1985).

10. "[P]roof that the discharge would have occurred in any event and for valid reasons amounted to an affirmative defense on which the employer carried the burden of proof by a preponderance of the evidence." *Transportation Management Corp.,* 462 U.S. at 400, 403, 103 S.Ct. at 2475.

(8th Cir.1985); *King v. Trans World Airlines,* 738 F.2d 255, 257–58 (8th Cir.1984).

Further, the Court's decisions in "pattern or practice" cases and class actions suggest that the burden of persuasion may in some cases properly be placed on the employer with respect to whether the same decision would have been reached even in the absence of discriminatory animus. In *Teamsters,* the Court held:

> By "demonstrating the existence of a discriminatory hiring pattern and practice" the plaintiffs had made out a prima facie case of discrimination against the individual class members; the burden therefore shifted to the employer "to prove that individuals who reapply were not in fact victims of previous hiring discrimination." ... The *Franks* case thus illustrates another means by which a Title VII plaintiff's initial burden of proof can be met. The class there alleged a broad-based policy of employment discrimination; upon proof of that allegation there were reasonable grounds to infer that individual hiring decisions were made in pursuit of the discriminatory policy and to require the employer to come forth with evidence dispelling that inference.

431 U.S. at 359, 97 S.Ct. at 1866 (footnote omitted). This shift is justified because "the finding of a pattern or practice changed the position of the employer to that of a proved wrongdoer." *Id.* at 359–

60 n. 45, 97 S.Ct. at 1867 n. 45; *Lee v. Washington County Board of Education,* 625 F.2d 1235, 1239 (5th Cir.1980); *Mims v. Wilson,* 514 F.2d 106, 109–10 (5th Cir.1975).

Several decisions of our sister circuits have adopted the *Mt. Healthy* causation standard in dual motive Title VII cases. *Miles,* 750 F.2d at 876; *Smith v. State of Georgia,* 749 F.2d 683, 687 (11th Cir.1985); *Smallwood v. United Air Lines, Inc.,* 728 F.2d 614 (4th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 120, 83 L.Ed.2d 62 (1984); *Bell,* 715 F.2d 1552 (11th Cir.1983); *Perryman,* 698 F.2d at 1143; *Day v. Mathews,* 530 F.2d 1083, 1085 (D.C.Cir.1976). *But see Norcross v. Sneed,* 755 F.2d 113, 118–119 (8th Cir.1985) (refused to apply *Mt. Healthy* to action under Rehabilitation Act of 1973, 29 U.S.C. § 794); *Toney v. Block,* 705 F.2d 1364 (D.C.Cir.1983). "Defendant cannot rebut this type of showing of discrimination [direct evidence of discriminatory motivation] simply by articulating or producing evidence of legitimate, nondiscriminatory reasons.... [D]efendant can rebut only by proving by a preponderance of the evidence that the same decision would have been reached even absent the presence of that factor." *Lee,* 684 F.2d at 774 (footnotes omitted). This is true whether the illegal motive is proven "by either circumstantial or direct evidence." *Id.; Zebedeo,* 582 F.Supp. at 1412 n. 7.[11]

We recently suggested approval of such a causation standard, noting that where

---

**11.** This analysis is not inconsistent with the burden-shifting provisions of *Burdine. League of United Latin American Citizens, Monterey Chapter 2055 v. City of Salinas Fire Department,* 654 F.2d 557, 558–59 (9th Cir.1981). *Burdine* does not assume that the employer is a wrongdoer, and, therefore, only requires that the employer produce evidence relative to the reason for discharge. To the contrary, *Transportation Management, Mt. Healthy,* and the instant case all involve proven wrongdoers—those who acted at least in part based on discriminatory intent. Accordingly, to require the employer to prove that he would have reached the same decision even in the absence of consideration of impermissible factors does not, as rejected in *Burdine,* require an employer to prove, in the first instance, that its decision was lawful. 450 U.S. at 257, 101 S.Ct. at 1095. In *Transportation Management,* the Court noted that *Burdine* "is inapposite" to the dual motive issue. The Court held that, in *Burdine,*

the question was who had "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff...." 450 U.S. at 253, 101 S.Ct. at 1093. The Court discussed only the situation in which the issue is whether either illegal or legal motives, but not both, were the "true" motives behind the decision. It thus addressed the pretext case.
462 U.S. at 400 n. 5, 103 S.Ct. at 2473 n. 5. On the issue of discriminatory intent, the employer need only *produce* evidence of legitimate business purposes for the discharge to combat any inferences of discriminatory intent that might be drawn from plaintiff's proof. However, once plaintiff has established that the discharge was likely motivated by discriminatory animus, plaintiff has established his case, and it is defendant's burden to *prove* that the discharge would have occurred despite the proven discriminatory animus.

there is "direct evidence of a facially discriminatory policy, the burden of persuasion would shift to the defendant to justify its actions by whatever means available." *Lujan v. Franklin County Board of Education*, 766 F.2d 917, 929 n. 16 (6th Cir. 1985), citing *Bell*, 715 F.2d 1552. *See also EEOC v. Maxwell Co.*, 726 F.2d 282, 283–84 (6th Cir.1984).

The Eighth Circuit has rejected the *Mt. Healthy* causation standard finding that

> [r]ather than requiring proof that race was a "substantial" or "determining" factor in the decision, we find that a plaintiff proves his claim of unlawful discrimination by showing that "a discriminatory reason more likely [than not] motivated the employer." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.... Nothing more is required of a plaintiff to establish liability under Title VII. Once the trier of fact has found that race was a factor influencing the decision, we find it error to attempt to quantify race as a minor factor....
>
> We find it inherently inconsistent to say that race was a discernable factor in the decision, but the same decision would have been made absent racial considerations. Thus, we think that once race is shown to be a causative factor in the employment decision, it is clearly erroneous to find that racial considerations did not affect the outcome of the decision.

*Bibbs*, 749 F.2d at 511–12. The court apparently relied on *Burdine* in refusing to shift the burden of proof to defendant. *Id.* at 513.

For two reasons, we decline to follow *Bibbs*. First, the court in *Bibbs* assumed that the *Mt. Healthy* standard places a greater burden on a plaintiff than does *Burdine*. We disagree. Under *Mt. Healthy*, a plaintiff must show by a preponderance of the evidence that his race or religion was a "motivating factor" in the

employer's decision to discharge him. Under *Burdine*, a plaintiff must show that the discharge was more likely than not motivated by race or religion. We discern no meaningful difference in these burdens. Second, the court in *Bibbs* indicated that if race was a motivating factor in the employer's decision, it would be "inherently inconsistent" to find that the same decision would have been made even in the absence of the unlawful motivation. We likewise disagree. Certainly, in some fact situations, a finding that an employment decision was motivated by discriminatory animus would effectively preclude an employer from contending that the same decision would have been made regardless of the employer's motivation. However, as the cases reveal, employment decisions are often complex, and, where dozens of factors are involved in evaluation of an employee, the fact that one such factor is impermissible does not necessarily preclude the contention that the adverse employment action would have been taken regardless of the impermissible factor. Of course, the fact that plaintiff's case has already been established before the burden shifts, emphasizes the difficulty of the employer's burden. Beyond this, we leave further elucidation of how an employer can meet his burden to the concrete facts of future cases.[12]

■ Accordingly, we hold that in order to prove a violation of Title VII, a plaintiff need demonstrate by a preponderance of the evidence that the employer's decision to take an adverse employment action was more likely than not motivated by a criterion proscribed by the statute. Upon such proof, the employer has the burden to prove that the adverse employment action would have been taken even in the absence of the impermissible motivation, and that, therefore, the discriminatory animus was not the cause of the adverse employment action.

---

12. We recognize, however, that "[h]aving injured respondent [plaintiff] solely on the basis of an unlawful classification, petitioner [employer] cannot now hypothesize that it might have employed lawful means of achieving the same result." *Regents of University of California v. Bakke*, 438 U.S. 265, 320 n. 54, 98 S.Ct. 2733, 2764 n. 54, 57 L.Ed.2d 750 (1978). Consideration of an employer's other grounds for discharge should not "result in fictitious recasting of past conduct." *Id.*

## III.

As noted above, the district court did not clearly articulate its allocation of the burden of proof. Since Blalock has demonstrated that religious discrimination was a motivating factor in his discharge, the burden of proving that even in the absence of discrimination Blalock would still have been discharged falls upon Metals Trades. That is, Metals Trades may avoid all liability by showing that even had Blalock maintained his initial religious views, his work performance was so intolerable to Metals Trades that he still would have been discharged.[13]

Accordingly, the judgment of the district court is REVERSED and REMANDED for further proceedings consistent with this opinion.

---

**13.** Although the district court concluded that Blalock "was fired because both Mr. Brewer and Mr. Woodward disliked his attitude toward his employers and his behavior and performance on the job," it is unclear under what allocation of the burden of proof the district court reached this conclusion. Since it is unclear both how the district court allocated the burden of proof and whether it concluded that Blalock's work performance, standing alone, was causally sufficient for his discharge, we must remand. We therefore have no occasion to pass on whether the current record would support a finding that Blalock would have been discharged on the date of his actual discharge even absent religious discrimination.

Because of our disposition of this case, we need not address Blalock's contention that the district court, after rejecting his claim based on the direct evidence, should also have evaluated the circumstantial evidence under the *McDonnell Douglas* framework.