21 F.3d 429
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Mary Alice WRIGHT, Plaintiff-Appellant,
v.
Mike ESPY, Secretary of Agriculture, United States
Department of Agriculture, Defendant-Appellee
 No. 92-6210.
 United States Court of Appeals, Sixth Circuit.
 April 18, 1994.
 
 Before: MARTIN and JONES, Circuit Judges; and DEMASCIO, District Judge.*
 PER CURIAM.
 
 
 1
 This is an age discrimination suit, brought under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Secs. 621-34, against the Secretary of the United States Department of Agriculture. Under our standard of deference to the district court's findings of fact, we are obliged to affirm.
 
 Facts
 
 2
 The Agriculture Stabilization and Conservation Service (ASCS), an agency of the United States Department of Agriculture, administers the national crop price support program through a nationwide network of county committees. Committee members are participating farmers within the county, elected by their peers. A county committee determines the eligibility of applicants for program benefits, and selects a County Executive Director (CED) to run the county's ASCS office. CED's are selected from a list of eligible individuals who have successfully completed a County Operation Training (COT) program.
 
 
 3
 Within each state, the county committees are supervised by a state committee and a state executive director. The Secretary of Agriculture appoints the director and committee members. One of the state committee's duties is to select the individuals who will enroll in the COT program, thereby becoming eligible to serve as CED's. The number of applicants selected to take the program is based on the projected number of CED vacancies within the state.
 
 
 4
 At all times relevant to this case, the Tennessee State Executive Director was Donald G. Walker, and the State Committee members were Billy H. Sparks, Ruth W. Culvahouse, Thomas L. Dixon, Jacob G. Hudson, and Lewis J. Collins. They were all Republican political appointees. The State Committee's policy was to interview every COT applicant who had the required educational background or job experience. The initial screening for these prerequisites was accomplished by the state ASCS office's Chief Administrative Officer, Rickey L. Dees. Since 1981, a COT class has been selected in Tennessee at least once per year.
 
 
 5
 Plaintiff Mary Alice Wright started working for the ASCS in 1954, when she was 18 years old. From 1965 to 1985, she worked in the Rutherford County, Tennessee ASCS office, as a project assistant under the direction of the local CED. In August 1985, the CED retired. The County Committee made Wright the acting CED, and told the state ASCS office that it wanted to hire Wright as its permanent CED. In order to qualify for the permanent position, Wright applied for the 1986 COT class.
 
 
 6
 According to Wright, when she spoke with State Director Walker and Chief Administrative Officer Dees about her application, they told her that her age would be a problem. Similarly, County Committee member Steve McKnight testified at trial that, when he went to the state office and spoke with Walker about the County Committee's wanting Wright to fill the CED vacancy, Walker told him that younger people were preferred for the COT program. Walker and Dees deny ever making such statements.
 
 
 7
 Apparently, the meeting between McKnight and Walker led to a great deal of animosity. The district court found that the conflict between the politically appointed State Committee and popularly elected County Committee was "both personal and political." J.A. at 28. Soon after the meeting, the State Committee interviewed Wright, along with all of the other qualified applicants, and subsequently rejected her application. The County Committee then failed or refused to appoint a new CED from the State Committee's approved list of COT graduates, and the State Committee appointed a new CED without the county's approval. The new CED resigned after only a year, due in part to the County Committee's refusal to cooperate with him. Consequently, Wright was once again named acting CED, and she refiled her application to enter the COT program.
 
 
 8
 McKnight and a new committee member, Ed Jordan, Jr., went back to the state office to promote Wright's cause. Both claim to have heard Walker say that younger people were preferred for the COT program. According to the district court, "[t]he discussion was rather terse and the hostility between Walker and McKnight was clear." J.A. at 27. Wright's application was again rejected.
 
 
 9
 One of the successful applicants for the 1987 COT class was Glenn P. Zarecor, a 24 year old with no prior ASCS experience. After Zarecor graduated from the COT program, during his interview for the Rutherford County CED vacancy, Jordan, on behalf of the County Committee, asked Zarecor about his political affiliation. Apparently Zarecor complained, and the State Committee suspended the County Committee on February 23, 1988. The next day, the State Committee replaced the former County Committee members with three new members, and named Zarecor the new CED. The new County Committee members, John Batey, Hoyt Parsons, and Bobby Holbrooks, testified at trial that, when Batey urged the appointment of Wright as CED, the State Committee Chairman, Billy Sparks, indicated that the State Committee preferred younger people. Sparks denies ever making such a statement, and some of the State Committee members present at the meeting corroborate Sparks' denial.
 
 
 10
 Upon Zarecor's appointment, Wright resumed her position as project assistant, but she reapplied for the 1988 COT program. One month after the new County Committee members were inducted, Batey gave Walker a list of demands. The list started with a criticism of the Republican Party for "its lack of respect or regard for women, minorities or persons who are not upper income males." J.A. at 222. The demands included the reinstatement of the suspended County Committee members, the transfer of Zarecor, and the acceptance of Wright into the COT program. Shortly thereafter, Wright received another interview, and was again rejected. Although she reapplied for the COT program in 1990 and again in 1991, and was rejected both times, it was the 1988 rejection that prompted the present suit. The State Committee selected seven applicants for the 1988 COT class. Of the seven, two were over forty, and one was actually older than Wright.
 
 
 11
 Wright filed a complaint of discrimination with the Department of Agriculture in August 1988. In April 1990, the Department found that no age discrimination had occurred. In May 1990, Wright filed her complaint in the instant case, alleging unlawful discrimination on the basis of both age and gender. On December 30, 1991, the district court granted partial summary judgment in favor of Defendant, disposing of Wright's gender discrimination claim. The gender discrimination issue is not before us on appeal. A bench trial on the merits of the age discrimination issue was conducted in March 1992.
 
 
 12
 The district court found that Wright was "impeccably qualified" to serve as Rutherford County CED. J.A. at 25. She had 34 years of ASCS experience, had trained other CED's, had spent nearly two years as acting CED, and, according to the County Committee members and her office coworkers, she was highly competent, efficient, and a good manager. The district court indicates that "the State Committee's decision [not to allow her to enter the COT program] was undoubtedly amiss." J.A. at 26. Nevertheless, the court recognized that its job was not to judge the wisdom of the State Committee, but rather to determine if age was a factor in the committee's rejection of Wright.
 
 
 13
 In its Conclusions of Law, the court found, first, that Wright failed to make her prima facie case. Although she clearly met three of the four requirements--she was a member of a protected class (over 40), highly qualified, and did not receive the position for which she applied--she failed to prove that a person outside of the protected class received the position she sought. After all, two of the seven people selected for the 1988 COT class were over 40, and one was older than Wright.
 
 
 14
 Second, the court concluded that the State Committee had set forth non-discriminatory reasons for its decision. Although Wright and most of the County Committee members each testified that Walker, Dees, and Sparks had expressed a preference that younger applicants be selected for the COT program, Walker, Dees, and Sparks denied ever making such statements. The district court weighed the competing testimony as follows:
 
 
 15
 [C]onsidering the animosity between the County Committee and the State Committee, the Court is disinclined to give great weight to the County Committee members' testimony concerning the alleged remarks. The Court, in effect, believes the testimony of the State Committee members that age was not a factor in their decision.
 
 
 16
 J.A. at 32. The district court found that there were two reasons that the State Committee rejected Wright. First, the court gave great weight to State Committee members' testimony that they rejected Wright because she did not interview well. J.A. at 25, 31. Second, the court concluded that Wright was simply caught in the middle of the political and personal feud between the County and the State Committees:
 
 
 17
 [T]here was no way the State Committee was going to accede to the County Committees' requests--particularly after the heated attacks made against the State Committee by some of the Rutherford County Committeemen. While the Court believes that the COT selection process is rife with favoritism and political considerations, age was not a factor in the State Committee's decision.
 
 
 18
 J.A. at 28-29.
 
 
 19
 Statistics bolstered the court's ultimate finding that age was not a determining factor in the State Committee's rejection of Wright:
 
 
 20
 In 1988, 10 of the 34 individuals (29.4%) who qualified for interviews for the COT class were over 40 years of age. Of the seven selected for the COT program, two were over 40 (28.6%). Since 1981, when the COT training program went into effect, there have been 24 person [sic] selected for the COT program who were over 40 years of age. Of that number, 10 were in their fifties, including one 56 year-old. The very class Wright applied for included one person who was actually older than Wright. This pattern of hiring certainly goes against Wright's contention that the State Committee preferred younger individuals.
 
 
 21
 J.A. at 29.
 
 
 22
 Consequently, the court entered judgment in favor of Defendant. This appeal followed.
 
 Discussion
 
 23
 * The ADEA protects a job applicant or an employee between the ages of 40 and 70 from discrimination on account of his or her age. See 29 U.S.C. Secs. 623(a), 631(a). It is well settled that, in an age discrimination case under the ADEA, the ultimate issue is whether age was a determining factor in the employment decision which adversely affected the claimant. Wooden v. Board of Education, 931 F.2d 376, 378 (6th Cir.1991) (citing Blackwell v. Sun Electric Corp., 696 F.2d 1176, 1179 (6th Cir.1983)).
 
 
 24
 As the district court correctly noted, due to parallels in the provisions of the ADEA and Title VII of the Civil Rights Act of 1964, courts apply the same principles of law to cases arising under either statute. Blackwell, 696 F.2d at 1179-80. Thus, relying on the Title VII standards developed in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973), the Sixth Circuit has long held that, in order to establish a prima facie case of age discrimination, a plaintiff is generally required to prove the following four elements:
 
 
 25
 (1) she was a member of the protected class (age 40 to 70);
 
 
 26
 (2) she was subjected to an adverse employment action;
 
 
 27
 (3) she was qualified for the position; and
 
 
 28
 (4) she was replaced by a younger person.
 
 
 29
 Stein v. National City Bank, 942 F.2d 1062, 1064-65 (6th Cir.1991).
 
 
 30
 If a plaintiff establishes a prima facie case, "the burden of production then shifts to the defendant employer to provide a legitimate nondiscriminatory reason for the action taken." Id. at 1065 (quoting Simpson v. Midland-Ross Corp., 823 F.2d 937, 940 (6th Cir.1987)). If the defendant provides such a reason, then the burden shifts back to the plaintiff to show that the proffered reason was but a pretext and that the true reason was discriminatory. Id. (citing Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 313 (6th Cir.1989); Simpson, 823 F.2d at 940).
 
 
 31
 Although the McDonnell Douglas framework outlined here is generally the standard to be used in ADEA and Title VII cases, there are exceptions, one of which is relevant to the present case. In this case, Plaintiff contends that the district court erred by applying the McDonnell Douglas guidelines mechanistically, thereby failing to consider the alternate way of establishing a prima facie case approved in Terbovitz v. Fiscal Court of Adair County, 825 F.2d 111, 114-15 (6th Cir.1987).[1] According to Terbovitz:
 
 
 32
 The McDonnell Douglas formula is inapplicable ... to cases in which the Title VII plaintiff presents credible, direct evidence of discriminatory animus. See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985); Blalock v. Metals Trades, Inc., 775 F.2d 703, 707 (6th Cir.1985). As this court stated in Blalock, "Direct evidence and the McDonnell Douglas formulation are simply different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent." Id. Direct evidence of discrimination, if credited by the fact finder, removes the case from McDonnell Douglas because the plaintiff no longer needs the inference of discrimination that arises from the prima facie case. Upon crediting the plaintiff's direct evidence, the district court finds facts requiring the conclusion that unlawful discrimination was at least a "motivating factor" for the employer's actions. See id. at 707-10. The existence of unlawful discrimination is patent, and if the employer does not propose an alternative explanation for its actions, Title VII liability will automatically follow.
 
 
 33
 825 F.2d at 114-15. A crucial footnote to this passage added that:
 
 
 34
 Of course, if the district court does not believe the plaintiff's proffered direct evidence, then the evidentiary framework of McDonnell Douglas is the proper mode of analysis. See Blalock v. Metal Trades, Inc., 775 F.2d 703, 707-08 (6th Cir.1985). Thus, as we said in Blalock: " 'When direct evidence of discrimination has been introduced, the lower court must, as an initial matter, specifically state whether or not it believes plaintiff's proffered direct evidence of discrimination.' " Id. at 708 (quoting Thompkins v. Morris Brown College, 752 F.2d 558, 564 (11th Cir.1985)).
 
 
 35
 Id. at 115 n. 3.
 
 B
 
 36
 Superficially, the contention that the district court should have applied Terbovitz rather than McDonnell Douglas alleges an error of law, which is to be reviewed de novo. See In re Edward M. Johnson & Associates, 845 F.2d 1395, 1398 (6th Cir.1988). However, the decision to apply the Terbovitz standard depends on the district court's finding Plaintiff's direct evidence to be credible. Similarly, Plaintiff's other two issues challenge the district court's weighing of the evidence or determinations of credibility. A district court's findings of fact and determinations of credibility are subject to a deferential "clearly erroneous" standard. Fed.R.Civ.P. 52(a); Anderson v. Bessemer City, 470 U.S. 564, 573-75 (1985). A finding of fact will only be clearly erroneous when, although there may be evidence to support the finding, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson, 470 U.S. at 573. When the findings rest on credibility determinations, Rule 52 requires even greater deference. Id. at 575. "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Bueno v. Mattner, 829 F.2d 1380, 1384 (6th Cir.1987) (quoting Anderson, 470 U.S. at 574), cert. denied, 486 U.S. 1022 (1988).
 
 C
 
 37
 Plaintiff argues that the Terbovitz exception to the McDonnell Douglas framework applies in the present case because she presented direct evidence of discrimination to the court. The problem with this argument is that it ignores note 3 quoted above--Plaintiff ignores the district court's specific statement that it did not believe Plaintiff's proffered direct evidence of discrimination. See J.A. at 32. Contrary to Plaintiff's assertions, the district court did not "ignore or fail to consider" Plaintiff's direct evidence; it simply gave the evidence little or no credence. The court specifically stated that, due to the evident hostility between the State and County Committees, it did not believe the County Committee members' testimony that they heard Walker, Sparks, and Dees say they preferred a younger person for the COT program. Thus, the district court did everything it was supposed to do, according to note 3 of Terbovitz, to express its lack of belief in the proffered evidence. It follows that McDonnell Douglas provides the proper mode of analysis in this case, and Plaintiff has not shown that the district court erred in finding that Plaintiff failed to establish a prima facie case.
 
 
 38
 Plaintiff seizes upon the district court's dictum that, even if Walker and Dees had stated that they preferred to accept younger applicants, it would be of "little relevance to the case," and that, even if Sparks had made such a statement, it would have been an "isolated statement which is insufficient to establish discriminatory motive." J.A. at 32. We agree with Plaintiff that this dictum is incorrect as a matter of law. If Sparks, Walker, and Dees did make the damning statements attributed to them, it would be highly relevant, and would place the case squarely under Terbovitz. Unfortunately for Plaintiff, the objectionable passage in the district court's opinion was followed by the telling sentence, "In any event, considering the animosity between the County Committee and the State Committee, the Court is disinclined to give great weight to the County Committee members' testimony concerning the alleged remarks." J.A. at 32. This sentence makes it clear that the objectionable passage was merely dicta and was not the primary basis for the district court's holding.
 
 
 39
 Because the district court's determinations of credibility are entitled to great deference, and because there is evidence to support the court's determination--i.e., the testimony of Walker, Sparks, and Dees denying that they ever made such statements--we can not say that the court's view of the evidence is impermissible. Though the district court's dictum makes us suspicious that perhaps the court weighed the evidence incorrectly; nevertheless, it is certainly not true that we are "left with the definite and firm conviction that a mistake has been committed." Anderson, 470 U.S. at 573, 574. Thus, we must affirm the court's rejection of Plaintiff's direct evidence.
 
 D
 
 40
 Plaintiff challenges some of the district court's other factual findings as well. She argues that the court erred in finding that Wright did not interview well, citing to the testimony of some witnesses that Wright did very well in the interview. However, Plaintiff herself admits that there was some evidence--namely the testimony of State Committee member Ruth Culvahouse--that she did not interview well. This testimony alone is sufficient to support the court's finding.
 
 
 41
 Similarly, Plaintiff argues that there is no evidence to support the court's conclusion that State Committee rejected her due to a political controversy between the State and County Committees. To the contrary, a review of the record indicates ample basis to support the district court's conclusion. See, e.g., J.A. at 229 (Trial Transcript of Testimony of Jordan).
 
 
 42
 We are sympathetic to Plaintiff, who appears to be a victim of pettiness and shortsightedness. However, in effect she is asking us to re-weigh the evidence considered by the court below, and this we cannot do. Even though it is possible that, were we the triers of fact, we might reach a different result than the district court, "the appellate court must vigilantly refrain from conducting a de novo review of the evidence." Mahoney v. United States, 831 F.2d 641, 645 (6th Cir.1987) (citing Anderson, 470 U.S. at 573-74), cert. denied, 486 U.S. 1054 (1988).
 
 Conclusion
 
 43
 For the foregoing reasons, the opinion of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Robert E. DeMascio, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Under the McDonnell Douglas standard, the district court found that Plaintiff could not establish the fourth element of her prima facie case. J.A. at 29-30. Plaintiff does not appear to disagree that she was unable to show that she was replaced by a younger person