856 F.2d 193
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James M. DAUGHERTY, Plaintiff-Appellant,
v.
CITY OF DANVILLE, KENTUCKY; Mayor Roy Arnold; Commissioner
John Bowling; Commissioner Mark Dexter; and
James Ryan, Chief of Police, Defendants-
Appellees.
 No. 87-5850.
 United States Court of Appeals, Sixth Circuit.
 Sept. 1, 1988.
 
 Before ENGEL, Chief Circuit Judge, and MILBURN, Circuit Judge, and DAVID D. DOWD, Jr., District Judge*.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant James Daugherty appeals from the district court's judgment in favor of defendants-appellees City of Danville, Kentucky; Mayor Roy Arnold; Commissioner John Bowling; Commissioner Mark Dexter; and Chief of Police James Ryan, in this action alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., the Civil Rights Act of 1866, 42 U.S.C. Sec. 1981, and the Civil Rights Act of 1871, 42 U.S.C. Sec. 1985(3). The issues on appeal are (1) whether the district court erred in holding that Daugherty had not established a claim of racial discrimination under a theory of disparate treatment, and (2) whether the district court erred in holding that Daugherty's claims under sections 1981 and 1985(3) were time-barred by the Kentucky statute of limitations for personal injury claims. For the reasons that follow, we affirm.
 
 I.
 
 2
 Daugherty, a forty-seven-year-old black male, joined the Danville, Kentucky, Police Department in 1979 as a patrolman. At the time Daugherty joined the police force, the Chief of the Danville Police Department was Everett Kidd. However, Kidd was subsequently succeeded by James Ryan. From the time of Daugherty's initial employment in 1979 through June of 1982, his performance was rated satisfactory by his supervisor.
 
 
 3
 Before September of 1982, various written guidelines of the police department warranted dismissal or other disciplinary action for behavior involving use of intoxicating beverages or conviction of any crime punishable by law. After September, 1982, more formal and extensive written guidelines were developed for Danville police officers. For example, the law enforcement Code of Ethics required officers to keep their "private life unsullied as an example to all," to "develop self-restraint," and "never (employ) unnecessary force or violence." The regulations required officers to maintain a high level of moral conduct in their personal affairs, and avoid any "moral turpitude" causing the Department "to be brought into disrepute." Regarding the use of weapons, officers were admonished about any use "in a careless or imprudent fashion," and at all times weapons were to be handled in a safe manner to prevent injury to innocent persons.
 
 
 4
 Between June 1982 and February 1983, Daugherty was involved in three separate incidents which, respectively, involved alcohol abuse, violent conduct with a weapon, and failure to perform a specific duty of his employment. On February 2, 1983, Chief of Police Ryan prepared written charges against Daugherty pursuant to state administrative law. See Ky.Rev.Stat.Ann. Secs. 15.520 (Michie/Bobbs-Merrill Supp.1987) and 95.450 (Michie/Bobbs-Merrill 1982). Daugherty was given advance notice and an opportunity to be heard on the charges. Id.
 
 
 5
 On February 11, 1983, a hearing was held and judgment rendered by a majority of the duly-elected and voting members of the Danville City Commission. The commission found that Daugherty had violated the applicable rules of conduct and requirements of his job on three separate occasions. As a result, he was discharged effective February 14, 1983. The dismissal was signed by Mayor Roy Arnold, Commissioner John Bowling, and Commissioner Mark Dexter. The two remaining city commissioners dissented from the degree of punishment. Daugherty was subsequently replaced by a white male.
 
 
 6
 On May 20, 1983, Daugherty filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a right-to-sue letter on September 10, 1984. In the letter, however, the Justice Department declined to file suit on Daugherty's behalf.
 
 
 7
 On December 7, 1984, Daugherty filed this action in the district court alleging racial discrimination in violation of 42 U.S.C. Secs. 1981, 1983, and 1985. He also raised pendent jurisdiction over a state law claim for intentional infliction of emotional distress.
 
 
 8
 On July 26, 1985, Daugherty filed a motion to amend his complaint, adding a Title VII claim for the first time. The district court subsequently granted leave to amend on September 16, 1985. On October 21, 1985, the defendants filed a motion for summary judgment and/or dismissal. The district court granted the motion for summary judgment by order dated April 24, 1986, and dismissed Daugherty's section 1983 and Title VII claims on statute of limitations grounds.[1]
 
 
 9
 Subsequently, on June 27, 1986, the defendants filed a motion for summary judgment on the remaining federal and state claims. The district court, on October 23, 1986, entered an order vacating, in part, its earlier order by reinstating the Title VII claim. The district court then dismissed the remaining section 1981 and section 1985 claims as being untimely. By order dated March 13, 1987, the district court declined to exercise pendent jurisdiction over the state claim.
 
 
 10
 The district court conducted a bench trial in March of 1987 on the surviving Title VII claim. On June 26, 1987, the district court entered findings of fact and conclusions of law, together with a judgment dismissing the Title VII action. Notice of appeal from the order entered on June 26, 1987, was filed on July 22, 1987.
 
 
 11
 At trial, the City alleged that it discharged Daugherty not because of his race, but because of three violations of departmental rules. The first instance of alleged misconduct occurred on June 11, 1982, when Daugherty was convicted of public intoxication in a neighboring city. He was initially charged with driving under the influence of intoxicants, but pleaded guilty to the lesser charge of public intoxication. Chief of Police Ryan learned of Daugherty's conviction when the state police notified him sometime later, about January of 1983.
 
 
 12
 On December 5, 1982, Daugherty was accused by Debbie Russell, his white mistress of three years, of striking her and pulling his service revolver from his holster during an argument. The incident was witnessed by two neighbors, who stated to the police on December 5, 1982, that Daugherty had drawn his weapon on Russell. Daugherty was formally charged with assault and terroristic threatening. The same day he was suspended from the police force by Chief Ryan.
 
 
 13
 At trial, Daugherty admitted that he had gone over to Russell's apartment that evening. He suspected that she was seeing another man, and he admitted that they got into an argument. In order to secure an arrest warrant against Daugherty, Russell claimed that Daugherty beat her with his fists, grabbed and shoved her, kicked her, pulled his gun on her, and threatened her.
 
 
 14
 Two next-door neighbors gave eyewitness written reports to the Danville Police Department substantiating Russell's allegations. One neighbor signed a statement to the effect that she heard screams and broken glass. She saw Daugherty pull out a gun, turn, and run back into Russell's apartment. She also saw Daugherty pulling Russell by the hair, smacking and punching her. She saw Daugherty point the gun directly at Russell and claim "I'll kill you." The other neighbor signed a statement stating that she saw Daugherty holding Russell by the hair, punching her in the face two or three times, and saw Daugherty hold a gun to Russell's face while yelling at her to get back inside the apartment.
 
 
 15
 Two police officers were dispatched to investigate the incident. Officer Steve Tolson observed a bruise on Russell's lip. He talked to the neighbors and took their statements. Another officer dispatched to investigate the incident, Officer John Kleckner, confirmed that Russell appeared to have been injured and confirmed that she pressed charges against Daugherty for brandishing a weapon and threatening her.
 
 
 16
 After an apparent reconciliation, Russell recanted the charges against Daugherty by a sworn statement and by sworn testimony at the discharge hearing. Prior to the discharge hearing, the state dismissed the assault and terroristic threatening charges against Daugherty due to the reluctance of Russell to testify. At trial, Russell claimed that Daugherty did indeed draw his weapon, but did so because she had drawn a knife on him. However, Daugherty gave conflicting testimony concerning the incident, as he adamantly claimed that he never drew his revolver, which he testified that he "carried ... religiously, on or off duty ... because a police officer is a police officer all day." Daugherty admitted that, although married, he had lived with Russell on and off in the past three years at the apartment where the incident took place.
 
 
 17
 The third incident used as a basis for Daugherty's discharge occurred on January 11, 1983. While still on suspension for the above incident, Daugherty failed to appear in the Boyle District Court as a witness on behalf of the state pursuant to a subpoena served November 23, 1982. As a result of Daugherty's failure to appear, misdemeanor charges were dismissed against the defendant in the state criminal action.
 
 
 18
 At trial, Daugherty claimed that he was discharged not because of rules infractions, but because he was a married black man involved with a white woman. In support of his claim, Daugherty supplied evidence that white officers had not been discharged for similar conduct, but had only been reprimanded or suspended.
 
 
 19
 Specifically, Daugherty offered evidence that Henry Bell, a white Major in the Danville police force, was arrested and charged with driving under the influence of intoxicants on August 19, 1976. At the time of his arrest, Bell was in a Danville police uniform and driving a Danville police cruiser on police business. Pursuant to a hearing before the Danville City Commission, Bell was suspended without pay for thirty days. Although Mayor Arnold was in office at that time, the incident involving Bell occurred prior to the current Chief of Police and City Commissioners' taking office.
 
 
 20
 Daugherty also offered evidence concerning John Deering, a white Danville police officer. In April of 1981, Deering's wife filed an assault charge against him. In May of 1981, she filed a harassment charge against him. In June of 1981, Deering reported an offense that his wife had assaulted and harassed him, requiring a trip to the hospital. Subsequently, Chief Ryan conducted internal hearings and found that the parties were having significant marital problems, that the wife had not been injured, and that weapons had not been drawn. Eventually, the wife and Deering voluntarily dismissed all charges, and Deering continued his police work.
 
 
 21
 About five years later, after he had remarried, Deering's new wife filed threatening and endangerment charges against him in January 1986. Three weeks later, however, she dismissed the charges. Ryan again conducted an internal hearing, found that no weapons or injuries were involved, and characterized this, like the past incident, as a private "marital squabble."
 
 
 22
 Daugherty also established that within several months of the date that he failed to appear in response to the subpoena, several white police officers committed the same infraction. The officers were not discharged, as Chief Ryan issued only a "stern reprimand" to each of the officers. However, Daugherty concedes that none of these officers had received any other charges within the six months preceding the respective infractions.
 
 
 23
 Additionally, Daugherty offered the deposition testimony of Gerald Watson, a white police officer who had worked for about two years with the Danville Police Department in the early 1980s. By deposition, Watson testified that Ryan had old him he was worried about certain police officers who were trying to organize against him, and that Daugherty was one of the officers. Watson deposed that Ryan mentioned in conversation "nigger troublemakers" that he wanted "to weed out." On another occasion, Watson overheard Ryan saying to another officer that "it just doesn't seem right to have a black officer going with a white girl and that he had to do something about it."
 
 
 24
 Ryan denied having any such conversation with Watson. However, several of the police officers who investigated the December 5, 1983, incident between Russell and Daugherty testified that they heard Ryan make a comment to the effect "that's what you get when you mix black and white."
 
 
 25
 Concerning the deposition testimony of Watson, Daugherty conceded at trial that in June of 1981, while Watson was on the police force, Watson's wife filed a mischief and harassment charge against him. At about the same time, another individual claimed Watson had called her, informing her that she was calling his wife to harass him. This individual filed a harassing communications charge against Watson. Approximately ten days later, all these charges were dismissed at the request of the prosecuting parties. Ryan suspended Watson initially and later reinstated him after all charges were dropped. However, Watson faced discharge proceedings later in 1981 involving the use of a weapon and alleged false reporting of an incident. Rather than proceed to a hearing, Watson resigned under the stipulation that his file would be sealed.
 
 
 26
 Following the bench trial, the district court found that Daugherty had established a prima facie case of race discrimination under the guidelines set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The court ruled, however, that the defendants had come forward with articulable and nondiscriminatory reasons for their actions; viz., three incidents of misconduct in a six-month period. Finally, the district court held that Daugherty had failed to show pretext. Although he found that the plaintiff was treated differently from white officers who violated similar rules of conduct, the court found that Daugherty's position differed significantly from that of the other white officers and that his infractions were cumulative within the six months prior to his termination. The other officers had committed only one of the infractions for which Daugherty was terminated, and none of their infractions involved the use of a weapon.
 
 
 27
 Finally, the district court found that Daugherty had failed to show any discriminatory intent on the part of Chief Ryan and the board in deciding to terminate the plaintiff. The court concluded that there was simply no credible evidence in the record indicating any discriminatory racial animus toward Daugherty. With regard to Chief Ryan, the district court found that Daugherty had received satisfactory work performance ratings for a number of years under the tenure of Ryan, and that after he left employment under Ryan, Daugherty used Ryan specifically as a reference for several other jobs. Moreover, the district court found that even if some racial animus could be attributed to Chief Ryan, there was absolutely no evidence of any racial animus or prejudice on the part of the Danville City Commissioners or the mayor, who voted for Daugherty's discharge.
 
 II.
 A. Title VII
 
 28
 Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to discriminate against an individual on the basis of his or her race, color, religion, sex, or national origin. 42 U.S.C. Sec. 2000e-2(a). In this case, Daugherty is attempting to establish a Title VII violation under the theory of disparate treatment. " 'Disparate treatment' ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin." International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15, (1977). In a disparate treatment Title VII action, "the plaintiff's ultimate burden is to persuade the court that he has been the victim of intentional discrimination." Shah v. General Elec. Co., 816 F.2d 264, 267 (6th Cir.1987). See also Daniels v. Board of Education, 805 F.2d 203, 206 (6th Cir.1986). Moreover, "[t]he plaintiff in a Title VII disparate treatment case bears the ultimate burden of persuasion on the issue of discriminatory intent." Daniels, 805 F.2d at 207.
 
 
 29
 If there is no direct evidence of discriminatory intent, then " '[p]roof of discriminatory motive ... can in some situations be inferred from the mere fact of differences in treatment.' " Shah, 816 F.2d at 267 (quoting Teamsters, 431 U.S. at 335 n. 15). In the absence of direct evidence of discriminatory intent, which is usually the case, the Supreme Court has established a three-step analysis for disparate treatment claims. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, a plaintiff must establish a prima facie case of discrimination. Then, the burden of production shifts to the defendant to establish a legitimate nondiscriminatory justification for its employment action. Finally, the plaintiff must prove that the legitimate nondiscriminatory reason proffered by the defendant is a mere pretext of discrimination. "Plaintiff's burden of showing pretext 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.' " Daniels, 805 F.2d at 207 (quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)). "Pretext may be shown 'either directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence.' " Id.
 
 
 30
 In McDonnell Douglas, the Supreme Court set out the requirements of a prima facie case of racial discrimination in a failure-to-hire case. The Court held that a prima facie case of race discrimination is established when a plaintiff shows:
 
 
 31
 (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications.
 
 
 32
 McDonnell Douglas, 411 U.S. at 802. See Shah, 816 F.2d at 268. A plaintiff is not required to produce any direct proof of discriminatory intent. Daniels, 805 F.2d at 208.
 
 
 33
 In a discharge case, however, "[a] slightly different test has been applied." Shah, 816 F.2d at 268. "A plaintiff must show ' that he is a member of a class entitled to the protection of the Civil Rights Act, that he was discharged without valid cause, and that the employer continued to solicit applications for the vacant position.' " Morvay v. Maghielse Tool & Die Co., 708 F.2d 229, 233 (6th Cir.), cert. denied, 464 U.S. 1011 (1983) (quoting Potter v. Goodwill Indus., 518 F.2d 864, 865 (6th Cir.1975)). See Becton v. Detroit Terminal of Consolidated Freightways, 687 F.2d 140, 141 (6th Cir.1982) ("plaintiff ... make[s] out a prima facie case by producing evidence (1) that he belongs to a racial minority, (2) that he was satisfactorily performing his job, (3) that despite this performance he was terminated, and (4) that he was replaced by a non-minority worker"), cert. denied, 460 U.S. 1040 (1983). "Failure to prove any one of these elements by a preponderance of the evidence mandates a dismissal of the plaintiff's suit." Morvay, 708 F.2d at 233.
 
 
 34
 The McDonnell Douglas formulation "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978). Thus, a failure of the district court to precisely apply McDonnell Douglas is not fatal. If "the district court has decided the ultimate factual issue, whether the plaintiff was the victim of intentional discrimination, the district court's failure to apply the correct legal standard in determining whether the plaintiff presented a prima facie case is no longer relevant." Daniels, 805 F.2d at 208.
 
 
 35
 If there is direct evidence of discriminatory intent, then if the trier of fact believes the testimony or evidence the ultimate issue of discrimination is proved. There is no need for an inference, and the McDonnell Douglas test and the shifting burdens contained therein are inapplicable. See Blalock v. Metals Trades, Inc., 775 F.2d 703, 707 (6th Cir.1985). In direct evidence cases, direct evidence of discrimination may not be rebutted by articulation of nondiscriminatory reasons for discharge, but the defendants are required to prove that the plaintiff would have been discharged even absent the racial discrimination. Blalock, 775 F.2d at 712. However, before a plaintiff can rely upon our holding in Blalock, he or she is required to present "credible, direct evidence of discriminatory animus." Terbovitz v. Fiscal Court, 825 F.2d 111, 115 (6th Cir.1987) (emphasis supplied).
 
 
 36
 Finally, in either situation, when a district court has made findings on whether or not a discharge was discriminatory, this court reviews only for clear error under Rule 52(a) of the Federal Rules of Civil Procedure. Daniels, 805 F.2d at 209; Blalock, 775 F.2d at 706-07. This court will overturn a district court's findings of fact only when it "is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). See Anderson v. City of Bessemer City, 470 U.S. 564 (1985); Daniels, 805 F.2d at 209; Blalock, 775 F.2d at 706. If the district court's findings on discrimination "are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson, 470 U.S. at 575.
 
 
 37
 In the present case, Daugherty contends that the alleged statements of Chief of Police Ryan are direct evidence of discrimination, and, therefore, the district court erroneously used McDonnell Douglas guidelines in reaching the conclusion that there was no discriminatory intent underlying Daugherty's discharge. We disagree.
 
 
 38
 First, the only undisputed statement made by Chief Ryan was his statement concerning his belief that disharmony and/or violence occurs "when you mix black and white." This statement might be viewed as indicative of racial animus on behalf of Chief Ryan. However, it does not provide direct evidence that Daugherty was discharged because of his race, as the discharge decision was not made by Chief Ryan.
 
 
 39
 As to the other alleged statements, the district court found that the testimony of Daugherty's witness, Gerald Watson, was not credible. Accordingly, the court chose to accord more weight to the testimony of Chief Ryan denying the statements, as the record reflects that at the time Watson made the statement he was a disgruntled former employee who had a history of disciplinary problems. Under these circumstances, we cannot conclude that the finding of the district court that Chief Ryan's denial of the statement should be afforded more weight is clearly erroneous. As this court has previously held, "if the district court does not believe [a] plaintiff's proffered direct evidence, then the evidentiary framework of McDonnell Douglas is the proper mode of analysis." Terbovitz, 825 F.2d at 115 n. 3.
 
 
 40
 The district court found, applying McDonnell Douglas, that Daugherty had presented a prima facie case in that (1) he belonged to a racial minority; (2) was satisfactorily performing his job; (3) was terminated despite his satisfactory performance; and (4) was replaced by a non-minority worker. However, the district court concluded that the defendants established a nonpretextual, legitimate and nondiscriminatory reason for Daugherty's discharge. We agree.
 
 
 41
 The record amply supports the district court's holding that Daugherty was discharged due to cumulative violations of the applicable rules of conduct and requirements of his job description, not because of racial animus. We find adequate evidence in the record to support the Danville City Commission's conclusions that Daugherty was guilty of all three charged violations. Therefore, while several white officers may have been treated differently for single violations of the rules of conduct, there were no other officers who had cumulative violations in a six-month period. Thus, the defendants did articulate a nondiscriminatory reason for Daugherty's termination.
 
 
 42
 We also agree with the district court that Daugherty has failed to establish that the above non-discriminatory reason is pretextual. Although Daugherty was treated differently from white officers who violated only one rule of conduct, there is no evidence in the record to support Daugherty's contention that his discharge was racially motivated. On the contrary, the record reflects that Daugherty was discharged because of his cumulative rules violations. Moreover, Daugherty has failed to provide any evidence of racial animus or intent on behalf of the City Commission. Therefore, we conclude that even if there is evidence of racial animus on behalf of Chief Ryan, the body actually discharging Daugherty had no such bias.
 
 
 43
 Instead of attempting to prove that the City Commission's decision was racially motivated, Daugherty contends that the City should be held vicariously liable for the acts of Chief Ryan through the theory of respondeat superior. See Meritor Savings Bank v. Vinson, 407 U.S. ----, 106 S.Ct. 2399 (1986). However, employers are not automatically liable for claimed Title VII violations of employee supervisors, as there is no absolute liability. Trial courts are to consider the equities of each case and apply pertinent agency principles. Meritor, 106 S.Ct. 15 2408.
 
 
 44
 In this case, there are two reasons why vicarious liability is inapplicable. First, Chief Ryan did not have the authority to terminate the employment of Daugherty. He was simply delegated with authority to bring charges against an employee. The charges are then considered de novo by the City Commission. Second, there is no evidence that the City Commission gave any undue credence to the testimony of Chief Ryan at the hearing. A full hearing was held, after which the City Commission made findings of fact and conclusions of law to support its dismissal of Daugherty.
 
 
 45
 The only evidence in the record to support vicarious liability is the fact that Ryan was the individual who brought the charges. However, simply delegating a supervisor with authority to bring charges against an employee does not create vicarious liability, as such would be tantamount to absolute liability. The action of a supervisor in bringing charges against an employee, even if discriminatory, does not "affect the tangible job benefits of [the] employee," Henson v. City of Dundee, 682 F.2d 897, 909 (11th Cir.1982), if a separate independent person or entity makes the discharge determination. Therefore, Daugherty's failure to provide any evidence of discriminatory animus or intent on behalf of the City Commission is fatal to his Title VII claim.
 
 B. Sections 1981 and 1985(3)
 
 46
 Daugherty contends on appeal that the district court's dismissal of his actions under 42 U.S.C. Secs. 1981 and 1985(3) were erroneous. Specifically, Daugherty contends that the district court erroneously gave retroactive application to the Supreme Court's holding in Wilson v. Garcia, 471 U.S. 261 (1985), in holding that the claims brought under sections 1981 and 1985(3) were time-barred.
 
 
 47
 Holdings subsequent to the district court's action in this appeal have cast some doubt as to the correctness of the district court's retroactive application of Wilson. In Goodman v. Lukens Steel Co., 107 S.Ct. 2617 (1987), the Court held that section 1981 claims should be treated as personal injury actions when selecting the appropriate state statute of limitations. However, the Court made it clear that statutes of limitations adopted by and applied in a judicial decision do not automatically apply retroactively, as retroactivity must be decided on a case-by-case basis in accordance with the principles set forth in Chevron Oil Co. v. Huson, 404 U.S. 97 (1971). Goodman, 107 S.Ct. at 2621-22; St. Francis College v. Al-Khazraji, 107 S.Ct. 2022, 2025-26 (1987). There is no dispute that the Chevron analysis was not conducted by the district court.
 
 
 48
 However, we find that the statute of limitations question has been rendered moot by the district court's holding on Daugherty's Title VII claim that there was no discriminatory animus or intent in his discharge. First, this court has repeatedly held that the order and allocation of proof in a section 1981 case is the same as in a Title VII action. See Shah, 816 F.2d at 267 n. 1; Daniels, 805 F.2d at 207. A finding of no discriminatory intent under Title VII would necessarily moot any limitations question, as the doctrine of collateral estoppel bars any recovery. See Cooper v. Federal Reserve Bank, 467 U.S. 867 (1984) (an adverse judgment on the merits of a Title VII class action barred further litigation of claims in a subsequent lawsuit brought under 42 U.S.C. Sec. 1981).
 
 
 49
 Moreover, we also conclude that the district court's holding of no discriminatory intent under the Title VII action bars any subsequent action under the section 1985(3) claim. In order to recover under section 1985(3), a party must not only show a conspiracy, but must show a conspiracy motivated by "some racial, or perhaps otherwise class based, invidiously discriminatory animus." Griffin v. Breckenridge, 403 U.S. 88, 103 (1971). Thus, the district court's finding that there was no discriminatory intent or animus in Daugherty's discharge necessarily precludes recovery under section 1985(3).
 
 
 50
 Even if the district court erroneously failed to conduct a Chevron analysis in determining that the sections 1981 and 1985(3) claims were untimely, the court's finding of no racial discrimination and that Daugherty's discharge was based upon nondiscriminatory, legitimate and nonpretextual reasons precludes a recovery under those claims. In light of the lack of any evidence of bad faith on the part of the district judge, any error on the statute of limitations with regard to these claims was rendered moot by the district court's finding of no discriminatory intent in the trial on Daugherty's Title VII claim.
 
 III.
 
 51
 Accordingly, for the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable David D. Dowd, Jr., United States District Court for the Northern District of Ohio, sitting by designation
 
 
 [1]
 Daugherty has not appealed the dismissal of his section 1983 claim, and his counsel confirmed this during oral argument