949 F.2d 397
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Anne P. VINCENTI, Plaintiff-Appellant,
v.
HILLIARD-LYONS, INC., Defendant-Appellee.
 No. 91-5374.
 United States Court of Appeals, Sixth Circuit.
 Dec. 5, 1991.
 
 Before MILBURN and RALPH B. GUY, JR., Circuit Judges, and GRAHAM, District Judge.*
 PER CURIAM.
 
 
 1
 The plaintiff in this Title VII sex discrimination case appeals a bench judgment in favor of her former employer. Finding no error, we affirm.
 
 I.
 
 2
 The plaintiff, Anne Vincenti,[1] worked as a trader in Louisville, Kentucky, for the defendant, Hilliard-Lyons, Inc., from 1983 until she was terminated in 1986. James Stuckert, manager of Hilliard-Lyons' over-the-counter trading department hired Vincenti upon her college graduation. The department has two types of traders, agency traders and principal traders. Agency traders typically earn less money than principal traders because agency traders do not receive commissions. Vincenti was hired as an agency trader. At the time of this lawsuit, all of the agency traders were female and all of the principal traders were male.
 
 
 3
 In 1985, Hilliard-Lyons hired Stuckert's son, Steve, as a principal trader upon his college graduation. Vincenti complained to Stuckert that she should have been made a principal trader because she had more experience than Steve. Stuckert responded by promoting her to principal trader. Vincenti thus became Hilliard-Lyons' first female principal trader. After the promotion, Vincenti complained to Stuckert that Steve was given better stocks to promote than she was.
 
 
 4
 On March 19, 1986, Vincenti became engaged to Greg Vincenti. Greg's father, Rudy Vincenti, was the senior vice-president and principal of J.C. Bradford & Co., a rival Louisville brokerage firm. At the time of the engagement, Greg Vincenti worked in the insurance industry.
 
 
 5
 Vincenti testified that when she informed Stuckert of her engagement to Greg, Stuckert offered his congratulations and seemed pleased. Eight days later, Vincenti told Stuckert that Greg had decided to leave the insurance business and work for his father at Bradford. Stuckert told her that he had concerns about this arrangement and asked if Greg would be willing to work for Hilliard-Lyons instead of Bradford. Vincenti told Stuckert that Greg wanted to work for his father at Bradford.
 
 
 6
 Stuckert's concerns about the potential for conflict continued to grow over the next several weeks. Rudy Vincenti visited Stuckert to discuss the problem but no solution was reached. On April 14, 1986, Stuckert informed Vincenti that she would be terminated effective May 31, 1986. Stuckert told her that he was concerned that she would divulge Hilliard-Lyons' proprietary information to Greg while engaged in "pillow talk" and that Greg would pass this information on to his father.
 
 
 7
 At Vincenti's request, Stuckert contacted Robert Lee, assistant manager of Hilliard-Lyons' municipal bond department, in an attempt to secure a transfer. Lee expressed the same concerns about the flow of proprietary information to Rudy Vincenti. Since Lee would not agree to the transfer, Hilliard-Lyons terminated Vincenti on May 31.
 
 
 8
 Hilliard-Lyons had no formal policy covering the employment of persons whose spouses worked for competing firms. However, at least four Hilliard-Lyons employees had spouses working for other brokerage firms. Ken Green worked as a Hilliard-Lyons trader while his wife worked as a trader for Almstedt Brothers, a local brokerage firm. Mike Roach worked as a broker for Hilliard-Lyons while his wife was a broker for Prudential-Bache. Mike McConnell worked as a Hilliard-Lyons computer programmer while his wife worked as a trader for Merrill Lynch. Finally, Mickie Bennett worked as a sales representative for Hilliard-Lyons while her husband worked for a competing firm. When McConnell's potential conflict came to light in the late 1970s, Hilliard-Lyons curtailed his access to sensitive information but allowed him to continue working as a computer programmer. Hilliard-Lyons transferred Bennett to a retail representative position at a branch office when Hilliard-Lyons learned of her husband's position. Hilliard-Lyons took no action involving Green or Roach.
 
 
 9
 After exhausting her administrative remedies, Vincenti filed this action in September 1987. Her complaint alleges that Hilliard-Lyons, by terminating her but not terminating male employees whose wives worked for competing brokerage firms, discriminated against her on the basis of her sex in violation of section 703(a)(1) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).
 
 
 10
 After discovery, the parties agreed to submit the case to the district court for a decision on the briefs, depositions, and affidavits in the record. In March 1991, the district court issued findings of fact and conclusions of law. The court first found that there was no direct evidence of sex discrimination. The court went on to find, however, that Vincenti had established a prima facie case of sex discrimination. The court next held that Hilliard-Lyons had met its burden of articulating a legitimate, non-discriminatory reason for the termination, namely concern over secrets passing to Rudy Vincenti. Finally, the court held that Vincenti had failed to show that Hilliard-Lyons' articulated reason was a pretext for sex discrimination. The court therefore entered judgment for Hilliard-Lyons.
 
 
 11
 Vincenti then filed this appeal.
 
 II.
 
 12
 A plaintiff in a Title VII disparate treatment case may prove discriminatory intent in one of two ways. First, a plaintiff may present "credible, direct evidence of discriminatory animus." Terbovitz v. Fiscal Court, 825 F.2d 111, 115 (6th Cir.1987). The term "direct evidence" refers to direct testimony that the employer acted with a discriminatory motive. The evidence is not direct if an inference is required. Blalock v. Metals Trades, Inc., 775 F.2d 703, 707 (6th Cir.1985). If the district court credits a plaintiff's direct evidence, then the discriminatory animus is found to be at least a motivating factor in the employer's actions. Id. at 711-12. Title VII liability automatically follows unless the employer can propose an alternative explanation for its actions. Id. If the employer does produce an alternative explanation for the action, the employer has the burden to show by a preponderance of the evidence that the same action would have been taken in the absence of the discriminatory animus. Id.; Price Waterhouse v. Hopkins, 490 U.S. 228, 252-53 (1989).[2]
 
 
 13
 Second, a plaintiff may establish discriminatory intent without direct evidence under the three-part framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981). If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the decision. Burdine, 450 U.S. at 253-54. If the employer meets its burden of production, the plaintiff can still prevail by showing that the proffered reason is a pretext for discrimination. Id. at 256.
 
 
 14
 The important difference between the two methods of establishing discriminatory intent is the allocation of burdens. If the plaintiff presents credible, direct evidence of discriminatory animus, the burden of persuasion shifts to the employer to explain its actions. If the plaintiff does not present direct evidence of discriminatory intent, the burden of persuasion remains with the plaintiff and the employer's burden is to articulate a legitimate non-discriminatory reason for its actions.
 
 
 15
 Vincenti argues that the district court erred by finding that she presented no direct evidence of discriminatory animus. Vincenti contends that two pieces of evidence, both credited by the district court, constitute direct evidence of discriminatory intent.
 
 
 16
 Vincenti first points to the finding that some male employees with wives in other brokerage firms were not terminated. This finding, while supportive of Vincenti's case, is not direct evidence of discriminatory intent. Since the factfinder must draw an inference from this evidence to conclude that Hilliard-Lyons had a discriminatory motive, the evidence is circumstantial, not direct. See Blalock, 775 F.2d at 707. This evidence is simply not of a kind with the sexist statements made by the defendants in Price Waterhouse and Terbovitz. We therefore hold that Vincenti's evidence of Hilliard-Lyons' allegedly different treatment of similarly situated male employees does not constitute direct evidence of discriminatory intent.
 
 
 17
 Second, Vincenti argues that Stuckert's concern that Vincenti would engage in "pillow talk" with her husband amounts to direct evidence of discriminatory animus. In common usage, "pillow talk" is a gender neutral term referring to intimate conversation by both men and women.[3] We therefore do not accept Vincenti's contention that the mere use of the term "pillow talk" amounts to the type of sexual stereotyping that can constitute direct evidence of discriminatory intent under Price Waterhouse.
 
 
 18
 Vincenti further argues that her termination indicates that Stuckert subscribed to the sexual stereotype that women are more likely than men to disclose secrets to their mates. While we acknowledge the existence of this stereotype, we find that Vincenti presented no direct evidence that Stuckert relied upon it to terminate her. Vincenti could have presented direct evidence of discriminatory animus by showing, for example, that Stuckert made a statement indicating a belief that women engage in "pillow talk" more than men. Since Vincenti did not present any such evidence, we affirm the district court's finding that she failed to show direct evidence of discriminatory animus.
 
 III.
 
 19
 Since Vincenti failed to present direct evidence of discriminatory intent, her claim is properly analyzed under the test outlined in McDonnell Douglas and Burdine. Vincenti argues that the district court's judgment for Hilliard-Lyons resulted from a misapplication of that test.
 
 
 20
 The district court first found that Vincenti had established a prima facie case of discrimination. Vincenti met the McDonnell Douglas test by showing that she was in a protected class, that she was qualified for her job, and that she was terminated. McDonnell Douglas, 411 U.S. at 802.
 
 
 21
 The court next found that Hilliard-Lyons had articulated a legitimate, non-discriminatory reason for her termination. Specifically, the court found that the danger of disclosure of proprietary information to Rudy Vincenti was a legitimate reason for Hilliard-Lyons' actions. Vincenti does not dispute the finding that fear of disclosure of confidential information to a competitor is a legitimate, non-discriminatory reason for an employment decision.
 
 
 22
 Vincenti argues instead that the non-discriminatory reason articulated by Hilliard-Lyons is false or pretextual. In the district court, Vincenti had the burden of persuasion to demonstrate that Hilliard-Lyons' proffered reason was not the actual reason for her termination. Burdine, 450 U.S. at 256. The district court concluded that Vincenti failed to meet that burden.
 
 
 23
 The determination of the reasons for an employer's actions is a question of fact. Pullman-Standard v. Swint, 456 U.S. 273, 289 (1982). We therefore use a clearly erroneous standard to review that finding. Id. at 290. The Supreme Court has explained a reviewing court's role under the clearly erroneous test:
 
 
 24
 This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.... Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 25
 Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985) (citations omitted). Therefore, we review the district court's finding that Hilliard-Lyons terminated Vincenti because of concern over loss of proprietary information only to decide whether that finding was based on a permissible reading of the evidence.
 
 
 26
 Vincenti argues that several of the district court's findings of fact support the conclusion that Hilliard-Lyons terminated her because of her sex. First, the district court found that Hilliard-Lyons did not terminate several male employees whose wives worked for other brokerage firms. The district court found, however, that these male employees were not similarly situated to Vincenti.
 
 
 27
 We find that this conclusion is supported by the evidence. Hilliard-Lyons explained that it was especially concerned by Vincenti's marriage because her fiance planned to work for his father, the principal of Hilliard-Lyons' chief competitor. None of the male Hilliard-Lyons employees had a wife who was both working for, and closely related to, a top manager of a competing firm.
 
 
 28
 The evidence also indicated that there were other significant differences between Vincenti's situation and that of two of the male employees. Hilliard-Lyons had taken action to restrict Mike McConnell's access to restricted information because of his wife's employment with a competing firm. Unlike McConnell, a computer programmer, Vincenti could not be transferred or restricted and still function as a broker. Indeed, Stuckert attempted to secure a transfer to the municipal bonds department for Vincenti, but the head of that department testified that he shared Stuckert's concerns about Rudy Vincenti. Unlike Vincenti's fiance, Ken Green's wife worked for a brokerage firm that was not regarded as a serious competitor to Hilliard-Lyons. Therefore, the district court did not clearly err in finding that the treatment of the male employees failed to establish that the reason for Vincenti's termination was pretextual or false.
 
 
 29
 Vincenti next argues that Stuckert's offer to hire Greg Vincenti shows that sex discrimination was the real reason for her termination. Vincenti contends that the offer to Greg demonstrates that Hilliard-Lyons believed a woman would disclose secrets but a man would not. Hilliard-Lyons responds that the offer to Greg was intended to protect its confidences by giving Greg an economic incentive not to pass information to his father. Hilliard-Lyons also points out that Stuckert was unconcerned about the imminent wedding until he learned that Greg was planning to work for his father. This shows, Hilliard-Lyons argues, that Stuckert's concern was that Greg would disclose information to his father if he had an economic incentive to do so.
 
 
 30
 There are two ways to view the offer to hire Greg. Vincenti urges that the offer is consistent with a belief that a man is less likely than a woman to divulge company secrets to a close relative. Hilliard-Lyons argues that the offer and the lack of concern until Greg began working for his father is consistent with a belief that a person is less likely to divulge secrets to a parent than to a spouse, unless the person has an economic incentive to divulge to a parent. We find that both of these views are based on permissible readings of the evidence. If the district court had adopted the first interpretation of the evidence, a finding of Title VII liability would have followed. Instead, the district court adopted the second interpretation and found that the offer to Greg did not establish sex discrimination. We cannot say that the district court clearly erred by adopting this reading of the evidence.
 
 
 31
 Finally, Vincenti contends that the reason given for her termination was pretextual because Stuckert wanted to eliminate his only female principal trader. Vincenti points out that Stuckert promoted her to principal trader only after she complained that she should have had the position given to Stuckert's son. Vincenti also points out that Stuckert never informed the head of the agency trading department of her promotion. From this fact, Vincenti concludes that Stuckert intended the promotion to be temporary. Vincenti also complained that Stuckert's son was allocated better stocks than she was. Vincenti alleges that these facts show that Stuckert fired her because of her gender, not because of her engagement.
 
 
 32
 The district court rejected this explanation of the termination. The district court noted that Stuckert was not concerned about Vincenti's engagement until he learned that Greg Vincenti planned to work for his father. Hilliard-Lyons also points out that Stuckert attempted to resolve the problem by hiring Greg. Hilliard-Lyons argues that if Stuckert wanted to fire Vincenti because of discriminatory animus, Stuckert would not have become concerned only after Greg announced his career change and would not have tried to resolve the problem by hiring Greg. We hold that the district court did not clearly err in finding that Hilliard-Lyons' proffered reason was not a pretext for a termination based on discriminatory animus.
 
 
 33
 Accordingly, we AFFIRM the judgment of the district court.
 
 
 
 *
 The Honorable James L. Graham, United States District Court for the Southern District of Ohio, sitting by designation
 
 
 [1]
 Vincenti is the plaintiff's married name. At the time of the events underlying this lawsuit, she was known as Anne Pollock
 
 
 [2]
 There is no opinion of the Court in Price Waterhouse. However, in their concurrences, both Justice White and Justice O'Connor agreed with the four-justice plurality that, when the plaintiff presents credible direct evidence of discriminatory animus, the burden of persuasion shifts to the employer to show that the same decision would have been reached without the animus. 490 U.S. at 259-60, 276
 
 
 [3]
 An examination of recent newspaper articles confirms that "pillow talk" is as commonly used to refer to disclosures by men as by women. See e.g., Jesse Katz, Beverly Hills Madam Avoids Going to Jail, L.A. Times, October 1, 1991 at B3 (prostitutes obtained incriminating information from male clients' "pillow talk"); Walter Goodman, Books of the Times, N.Y. Times, August 15, 1991 at C18 (book review of novel in which woman uses man's "pillow talk" to undermine him)