**Warner L. WAGNER, Plaintiff,**

v.

**CITY OF MEMPHIS, et al., Defendants.**

**No. 94–2931 M1/V.**

United States District Court,
W.D. Tennessee,
Western District.

June 19, 1997.

---

Jennifer W. Sammons, Saul C. Belz, Earle J. Schwarz, Waring Cox, Memphis, TN, Robert L.J. Spence, Jr., Hardison Law Firm, Memphis, TN, Richard B. Fields, Law Offices of Richard B. Fields, Memphis, TN, J. Michael Fletcher, Law Offices of J. Michael Fletcher, Memphis, TN, Michael Fletcher, Asst. City Atty., Memphis, TN, for Defendants.

## MEMORANDUM OPINION AND ORDER

McCALLA, District Judge.

Plaintiff, Warner L. Wagner, a white male police lieutenant employed by the City of Memphis, brings this suit under 42 U.S.C. § 1983 against the City of Memphis, Mayor W.W. Herenton, and Walter L. Winfrey, Director of Police Services, alleging violations of the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution. A bench trial was conducted on August 19 and 20, 1996, with final submittals and argument completed on September 27, 1996. For the reasons set forth in this opinion, the Court finds that plaintiff's constitutional rights were violated by Mayor W.W. Herenton and the City of Memphis. Accordingly, judgment is ENTERED in favor of plaintiff against Mayor Herenton and the City of Memphis in the amount of $80,685.50, plus reasonable attorney's fees and costs. As to plaintiff's claims against defendant Walter Winfrey, judgment is ENTERED in favor of defendant Winfrey. Finally, the Court finds that plaintiff is entitled to punitive damages against Mayor Herenton. A hearing to determine the amount of such damages is set for Friday, July 25, 1997, at 2:00 p.m.

### FINDINGS OF FACT

1. Plaintiff is a forty-eight year old, white male resident of Memphis, Tennessee, and is employed as a police lieutenant by the City of Memphis, Division of Police Services.

2. Plaintiff has been a police officer for the City of Memphis for twenty-six years. Of those twenty-six years, he has been a police lieutenant for four years.[1] As a police

Mark A. Allen, Agee Allen Godwin Morris Laurenzi & Hamilton, Memphis, TN, for Plaintiff.

---

1. A police lieutenant is generally responsible for planning and organizing the daily activities of

officer, he is covered by the Civil Service Ordinances of the City of Memphis. These ordinances by their terms require just cause for discharge of covered City employees.

3. The City of Memphis is a municipal corporation and a political subdivision of the State of Tennessee, which, in addition to providing other services, operates a police department.

4. Defendant Mayor W.W. Herenton is the Chief Executive Officer of the City of Memphis and its chief policy making official.

Defendant Walter Winfrey is the Director of Police Services for the City of Memphis.

6. On April 8, 1994, at 11:30 p.m., an incident occurred at the intersection of Poplar Avenue and Yates Road in Memphis, Tennessee, involving several Memphis Police Department ("MPD") officers. The incident developed as follows: While on duty on the night of April 8, 1994, Lt. Wagner observed a black Cadillac speeding east on Poplar Avenue. Lt. Wagner then began his pursuit of the vehicle, which ended when the Cadillac stopped at or near the intersection of Poplar and Yates. At that time, Wagner got out of his vehicle and approached the Cadillac, which had two occupants, both African-American males. Wagner instructed the occupants, Charles Cox and James Mack, to get out of the vehicle. Cox and Mack, however, did not comply with Wagner's instructions. By this time, several other MPD officers had arrived at the scene. After Cox and Mack refused to exit their vehicle, an altercation ensued, during which Wagner sprayed both Cox and Mack in the face with pepper gas (a chemical agent known as "Freeze") and eventually subdued and handcuffed Cox. As it turned out, Cox and Mack were undercover MPD officers.

7. That same night, George L. Stacy, the Deputy Chief of the Uniform Patrol Division of the MPD, was notified of the incident, went to the scene, and subsequently went to the MPD's Central Precinct to speak to the officers who had been present at the scene. In particular, Stacy spoke to Lt. Wagner, Officer Cox, Officer Mack, and Central Precinct Commander, Inspector Mullins. Stacy then turned the investigation over to Lt. Townsend of the Security Squad, an internal investigatory arm of the MPD.

8. The next morning, April 9, 1994, Stacy advised Eddie Adair, Deputy Director of Police, of the incident by telephone. That same morning, Deputy Director Adair telephoned Melvin Burgess, Director of Police, and advised him of the incident. In addition, Deputy Director Adair directed the Security Squad to investigate the incident.

9. On April 10, 1994, Deputy Director Adair and Director Burgess attended a reception for City officials at the home of David Hanson, the Chief Administrative Officer for the City of Memphis. At this reception, Adair and Burgess briefed Mayor Herenton and Hanson on the April 8, 1994 incident and assured them that the matter was being investigated. Adair and Burgess advised Mayor Herenton and Hanson that the investigation was underway and would be finished by the end of the following week and that a hearing would then be set.

10. On April 11, 1994, Wagner was relieved of duty with pay pending an investigation of the April 8, 1994 incident. On April 13, 1994, at the conclusion of the Security Squad's investigation, Lt. Townsend issued a statement of charges against Wagner, charging Wagner with violating D.R. # 101, compliance with regulations, and D.R. # 120, neglect of duty.[2] An administrative summons was also issued, requiring Wagner to appear for a hearing on the statement of charges to be held before Deputy Chief Stacy on April 15, 1994.[3] Lt. Wagner was the only officer involved in the April 8, 1994 incident against whom a statement of charges was lodged.

---

the officers under his command, as well as making daily assignments to patrol cars, handling roll call, providing training, and administering discipline.

**2.** Prior to the April 8, 1994 incident, Wagner had never received any discipline.

**3.** Adair assigned Stacy to conduct Wagner's hearing, in part, because of the concern about the publicity that had been associated with the April 8, 1994 incident.

11. On April 15, 1994, Wagner appeared at Stacy's office at the scheduled time with Ray Maples (the then-President of the police officers' union, the Memphis Police Association ("MPA")). Prior to the actual hearing, Stacy had a brief discussion with Wagner and Maples regarding the procedure for the hearing and advised Lt. Wagner that he considered some of the events of April 8, 1994 to be very serious. Stacy also explained that he had some real concerns about the incident and that some of the things that took place made him question plaintiff's ability to continue to be a police lieutenant.[4] Although there is a conflict as to what happened next, a continuance was ultimately granted, and the April 15, 1994 hearing was continued for four days until April 19, 1994.

12. Following the meeting with Stacy, Wagner began experiencing chest pains. He then scheduled an appointment and was seen by Dr. William J. Oswald, who began treatment on that date. On that same day, Dr. Oswald reported to Harold Bruce of the MPD that he had treated Wagner for high blood pressure and chest pains. Once Stacy learned of Wagner's doctor visit, the April 19, 1994 hearing was postponed indefinitely.

13. Sometime after April 15, 1994, but prior to Wagner's actual hearing, Deputy Director Adair had a conversation with Mayor Herenton in Herenton's office, in which Wagner's situation was discussed. In that discussion, Mayor Herenton told Director Adair that he was concerned about the pepper spray incident and that he wanted Wagner fired because he was "getting a lot of pressure from the black community" over the incident (i.e., a white police officer pepper spraying two black police officers). Herenton then asked Adair if Adair knew who elected him, to which the Mayor replied, "Black people elected me."

Adair advised the Mayor that Wagner was entitled to due process and that the investigation of the April 8, 1994 incident was not yet complete. Adair also assured Herenton that the matter was being investigated and that he would advise the Mayor as soon as the investigation was completed.

14. In late April or early May 1994, Director Burgess received a telephone call from Mayor Herenton's Executive Secretary requesting that he and Deputy Director Adair appear at Herenton's office. Burgess then called Adair and requested that Adair appear with him at Herenton's office.

15. When Burgess and Adair arrived at the Mayor's office, the Mayor told them, "You all are killing me politically." Once again, the Mayor stated that he was getting pressure from the black community over the April 8, 1994 incident and that he wanted Wagner fired. In addition, the Mayor said that Wagner was a racist and that he did not believe that they, Burgess and Adair, were handling the Wagner case correctly. Herenton also advised Burgess and Adair that since they had been at the police department they did not have a handle on racism.

In response, Burgess explained to the Mayor that when an officer is faced with charges that were serious enough to warrant termination, they often go to a doctor for treatment. Burgess said that during the time that an officer was undergoing treatment, he could not order that officer to appear for a hearing without consulting the officer's doctor. Also during this conversation, Adair attempted to explain the due process requirements and proceedings afforded to police officers in Wagner's situation (i.e., notice, opportunity to be heard, internal appeal, and a hearing before the Civil Service Commission). Herenton asked Burgess and Adair, "do you all know who elected me . . .; black people elected me, white folks didn't elect me."

16. After the meeting, in the parking garage of City hall, Burgess and Adair discussed what the Mayor had ordered them to do, i.e., fire Wagner.[5] Adair stated that they were in a "Catch 22." Adair was concerned that the investigation had not been completed, that there were indications of violations

---

4. Although Stacy had concerns, he testified that he had not yet decided what Wagner's punishment would be at the time of this conversation with Wagner and Maples.

5. At trial, Burgess testified that he had never before been ordered by the Mayor to terminate an employee.

of MPD policies on the part of other officers involved in the April 8, 1994 incident, and that they were not being allowed to complete the investigation.

17. Nonetheless, that same day, Director Burgess contacted Wagner's doctor to see if a hearing could be held and was told that a hearing could be held in a few days. Burgess then met with Deputy Chief Stacy and advised him to immediately set up a hearing for Wagner. Burgess told Stacy that the Mayor wanted Wagner terminated, to which Stacy replied, "Yes sir."

18. On May 9, 1994, an administrative hearing was held before Deputy Chief Stacy. In attendance at that hearing on behalf of Lt. Wagner was Officer Bryant Jennings, MPA President. Plaintiff called several witnesses to testify, and the hearing took approximately eight hours.

19. At the conclusion of the hearing, Stacy told Officer Jennings and Lt. Wagner that he was recommending Wagner's termination.[6] Stacy then asked Wagner if he wanted to appeal the decision internally, and Wagner expressed his desire to do so.

20. On May 11, 1994, Stacy issued a Hearing Summary Form, in which he sustained the charges against Lt. Wagner, in part, and recommended Wagner's termination. In the form, Stacy explained that he found that Wagner, as the officer in charge of the scene, had

> failed to provide for the safety of persons present, and through his actions, created a hostile and potentially dangerous situation, which could have been avoided had he applied proper apprehension methods and techniques he has been trained to utilize. Lt. Wagner also violated the departmental vehicle pursuit policy and the departmental policy governing the use of the chemical agent Freeze.

At trial, Stacy testified that although he believed that Wagner had violated police policies on the night of April 8, 1994, he did not agree with Wagner's punishment (i.e., termination).

21. Stacy's recommendation of termination, however, was not final under MPD policy as it existed at that time. Under that policy, Wagner still had an appeal to the Deputy Director, and, until that final appeal was reached, his pay status would not change.

22. On May 12, 1994, Lt. Wagner signed the Hearing Summary Form, indicating that he wanted to appeal Stacy's decision to the Civil Service Commission, by which both parties understood that Wagner intended to seek a further appeal to the Deputy Director as provided by the MPD's Policy and Procedure Manual. On May 12, 1994, Stacy issued an Administrative Summons to Wagner, notifying him of a "Hearing Appeal" at the offices of the Deputy Director at 9:00 a.m. on May 17, 1994.

23. Prior to the date of the appeal hearing, both Director Burgess and Deputy Director Adair were terminated by the Mayor, effective May 12, 1994, and defendant Winfrey was named Interim Director.[7] On May 13, 1994, Director Winfrey instructed Stacy to draft a letter for Winfrey's signature terminating Wagner. That same day, Winfrey sent a letter to Wagner confirming his termination and directing him to appeal the decision to the Civil Service Commission. On May 16, 1994, Wagner made a formal written appeal to the Civil Service Commission.

24. On May 17, 1994, Wagner and Jennings appeared at the Deputy Director's office in compliance with the May 12, 1994 Administrative Summons. When Winfrey was advised of the hearing, he indicated that he had no knowledge of it. At this time there was a large crowd of cameras and reporters behind Jennings and Wagner, and Director Winfrey escorted Jennings and Wagner to the back offices and called in Deputy Director William Oldham. At that time, Winfrey advised Jennings that the policy regarding appeals was changing and that he would no longer allow appeals in such

---

6. At trial, both Burgess and Stacy testified that the outcome of the May 9, 1994 hearing, i.e., Wagner's termination, had been decided in advance per the Mayor's instructions.

7. The fact that Wagner remained on the payroll prompted Herenton's decision to fire Burgess and Adair.

cases. Jennings then asked, "Do you mean you are going to go against twenty years of past practice and policy and deny this officer an appeal?" Winfrey responded that he was going to deny Wagner the right to an internal appeal.[8]

25. On June 24, 1994, Wagner appeared before the Civil Service Commission for a hearing on his appeal. At the conclusion of the preliminary hearing, the Civil Service Commission remanded the case to the MPD for a hearing pursuant to the May 12, 1994 Administrative Summons. An Administrative Summons was issued on June 27, 1994, instructing Wagner to appear for an appeal hearing on June 30, 1994, before Deputy Director Oldham.

26. On June 30, 1994, a hearing was held before Director Oldham with Bryant Jennings again representing Wagner. By Appeal Hearing Summary, dated June 30, 1994, Deputy Director Oldham sustained the charges against Wagner but modified the discipline from termination to an eight day suspension without pay.[9]

27. As a result of his eight day suspension, Wagner suffered lost wages for eight working days, including July 8, 9, 10, 11, 12, 15, 18 and 19, 1994.

28. As a direct result of defendants' conduct, Wagner suffered from depression and insomnia.[10]

29. As a direct result of defendants' conduct, Wagner was subjected to intense media scrutiny and was labeled as a police officer "fired" for misconduct. In addition, as a direct result of statements made by defendant Herenton to the media, Wagner was accused of being part of a "good old boy network" and was branded a racist.

30. As a direct result of defendants' conduct, Wagner's reputation among his fellow police officers was damaged.[11] Defendants' conduct convinced many officers, particularly many black officers, that Wagner was a racist. As a result, Wagner has been shunned by many of his fellow officers. Although this may have been, in part, the result of the April 8, 1994 incident, plaintiff presented sufficient evidence to support his assertion that defendants' conduct added greatly to the perception that he was a racist officer. In addition, as of the date of trial in this matter, Wagner has been relieved of his supervisory duties and is presently assigned to a small office between the garage and boiler room in the basement of the Shelby County Substation, charged with running DUI tests.

31. As a direct result of defendants' conduct, Wagner's reputation in the community was damaged. Examples of Wagner's diminished reputation include encounters that he had with his neighbors, in which they have refused to talk to him, and an instance in which a black waitress at a restaurant frequented by Wagner refused to serve him.

32. As a direct result of defendants' conduct, Wagner has been subjected to personal humiliation and mental anguish and suffering.

33. As a direct result of defendants' conduct, Wagner was forced to incur attorney's fees to pursue his claim before the Civil Service Commission and to pursue his claim before this Court.

---

8. Prior to this time, Winfrey had not informed anyone of the change in policy.

9. At trial, Stacy testified that Oldham informed him prior to the June 30, 1994 hearing that he was going to rescind Wagner's termination and suspend him for a period of less than ten days so that Wagner could not again appeal to the Civil Service Commission.

10. Although Wagner presented evidence that he suffered other medical problems and expenses, Dr. Oswald's deposition testimony as to the expenses Wagner incurred and the direct and proximate causes of Wagner's medical conditions was equivocal. In particular, it was not clear whether the medical expenses sought by Wagner related to conditions that preceded the events of May 9, 1994, whether those expenses had in fact been paid by the City, or whether Wagner's pre-existing conditions, diabetes and high blood pressure, were aggravated by defendants' conduct.

11. Testimony at trial supported the assertion that a police officer must maintain a good reputation among his fellow officers, particularly as a supervisor, given the unique life and death circumstances that often confront police officers in the line of duty. An officer who is not trusted or who is not perceived to be a "team player" is often ineffective.

**316**

## CONCLUSIONS OF LAW

Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction over plaintiff's claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

Section 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. To recover under § 1983, a plaintiff must prove: (1) that he was deprived of a right secured by the United States Constitution or federal law; and (2) that the deprivation of that right was carried out by a person acting under color of state law. *Adams v. Metiva,* 31 F.3d 375, 386 (6th Cir.1994). In this case, there is no dispute that the second element has been satisfied.

Plaintiff sues the City of Memphis, its mayor, W.W. Herenton, and its director of police, Walter Winfrey. Although defendants Herenton and Winfrey are sued in both their official and individual capacities, it is well settled that "[a] suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones,* 35 F.3d 1046, 1049 (6th Cir.1994). Here, the governmental entity is the City of Memphis. Thus, plaintiff's claims against Herenton and Winfrey in their official capacities are construed as claims against the City.

 Although it is well established that there is no respondeat superior liability under § 1983, *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), a municipality may be liable when the injuries suffered by a plaintiff "were the result of an unconstitutional policy or custom" of the municipality. *Id.* at 691, 694, 98 S.Ct. at 2036, 98 S.Ct. at 2037–38. Specifically, a municipality is liable under § 1983 "when execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694, 98 S.Ct. at 2037–38.

 To this extent, a municipality may be liable under § 1983 where "a deliberate choice to follow a course of action is made from among various alternatives by the official ... responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1299–1300, 89 L.Ed.2d 452 (1986) (plurality opinion); *accord Feliciano v. City of Cleveland,* 988 F.2d 649, 655 (6th Cir.1993). "More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299. In this case, it is undisputed that Mayor Herenton is the chief policy maker for the City of Memphis.

In this case, plaintiff asserts two constitutional violations: (1) violation of the Due Process Clause of the Fourteenth Amendment; and (2) violation of the Equal Protection Clause of the Fourteenth Amendment. Specifically, plaintiff claims that the May 9, 1994 pre-termination hearing was constitutionally inadequate and that the denial of an internal appeal to the deputy director was also constitutionally impermissible. In addition, plaintiff claims that he was fired by Mayor Herenton, who is African–American, because of plaintiff's race.

### 1. *Procedural Due Process Claim*

 The Due Process Clause of the Fourteenth Amendment provides, in relevant part: "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. Here, plaintiff's due process claim depends upon his having a property interest in continued employment with the MPD. *See Schaper v. City of Huntsville,* 813 F.2d 709, 713 (5th Cir.1987) (citing *Bishop v. Wood,* 426 U.S. 341, 343–47, 96 S.Ct. 2074, 2076–78, 48 L.Ed.2d 684 (1976); *Board of Regents v. Roth,* 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972)). "The Con-

stitution[, however,] does not create property interests; 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Id.* (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709). In this case, plaintiff derives a property interest from the Civil Service Ordinances of the City of Memphis, which require just cause for discharge of covered City employees. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 539, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985). "Once a state has conferred a property right, it cannot constitutionally deprive such an interest without appropriate procedural safeguards." *Schaper,* 813 F.2d at 714.

In *Loudermill,* the Supreme Court set out the scope of pre-termination procedures that are due public employees. 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494. Although *Loudermill* requires that an employee with a property interest in his employment be afforded "some kind of hearing" before he may be discharged, 470 U.S. at 542, 105 S.Ct. at 1493, "[i]n general, pretermination 'hearings' need not be elaborate," *Schaper,* 813 F.2d at 714. In *Loudermill,* the Court explained that, in addition to providing post-termination administrative procedures,

> [t]he essential requirements of due process [in pre-termination proceedings] ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.

470 U.S. at 546, 105 S.Ct. at 1495 (citations omitted).

At the same time, "[t]he purpose [of the pre-termination hearing] is not to 'definitively resolve the propriety of the discharge,' as would be the case at the later formal hearing." *Duchesne v. Williams,* 849 F.2d 1004, 1007 (6th Cir.1988) (en banc) (quoting *Loudermill,* 470 U.S. at 545, 105 S.Ct. at 1495). "Rather, the hearing's purpose is limited:

> "It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."

*Id.* (quoting *Loudermill,* 470 U.S. at 545–46, 105 S.Ct. at 1495). "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495.

■ In this case, it is clear that plaintiff was afforded a pre-termination hearing—the May 9, 1994 hearing before Deputy Chief Stacy. At that hearing, plaintiff received notice of the charges against him, an explanation of the employer's evidence, and an opportunity to respond. In addition, plaintiff was afforded a post-termination administrative hearing before the Civil Service Commission. It appears, therefore, that plaintiff received the process that he was due under the Constitution. *See Loudermill,* 470 U.S. at 547–48, 105 S.Ct. at 1495–96. Moreover, although an internal appeal to the deputy director may have been provided for in the MPD's Policy and Procedure Manual, such an appeal is not constitutionally mandated. See *id.*.

■ Plaintiff contends, however, that the May 9, 1994 hearing before Stacy was meaningless because the outcome had been predetermined by the Mayor, i.e., the Mayor had already ordered that Wagner be terminated regardless of what transpired at the hearing. This argument is factually supported by Stacy's and Burgess's testimony at trial.

A similar argument was addressed in *Duchesne,* in which the Sixth Circuit Court of Appeals addressed the issue of whether a discharged municipal employee was required to receive a pre-termination hearing before a neutral and impartial decision maker rather than before the supervisor who is responsible for the employee's termination. *Id.* at 1005. The court concluded that such an employee was not entitled to a neutral and impartial decision maker at the pre-termination hearing. *Id.* at 1007. The court also noted:

We acknowledge that there may be cases—perhaps this is one of them—in which the supervisory official is so biased that the *Loudermill* "right-of-reply" process is meaningless. The full, post-termination, adversary, trial-type hearing will serve to ferret out bias, pretext, deception and corruption by the employer in discharging the employee. The adversary processes employed in an adjudicatory, post-termination hearing controlled by an impartial judge lend themselves to proving wrongful conduct by the employer. The limited, "right-of-reply" pretermination hearing, as defined in *Loudermill*, is designed "to invoke the employer's discretion," his sense of fairness and mutual respect, his willingness to reconsider. It is not designed or well-adapted to uncover the employer's bias or corrupt motivation.

849 F.2d at 1008; *accord Schaper*, 813 F.2d at 716 ("We conclude, as a matter of law, that Schaper's allegations of bias and conspiracy do not state a procedural due process claim.").

In this case, however, plaintiff has shown that his hearing was meaningless not because Stacy was biased against him, but because the outcome of the hearing was predetermined—he was going to be fired regardless of what was presented at the May 9, 1994 hearing. Thus, in this respect, this case is distinguishable from *Duchesne*.

A case involving a more analogous fact pattern is *Bettio v. Village of Northfield*, 775 F.Supp. 1545 (N.D.Ohio 1991). In *Bettio*, the plaintiff alleged that his due process rights were violated when he was suspended based on charges that were known to be false by supervisory officials. Although a pre-termination hearing was held, the court concluded that the plaintiff had stated a due process violation claim because a pre-termination hearing that is presided over by supervisory officials who brought knowingly false charges against an employee "deprives the hearing of any and all meaningfulness. Such a hearing, clearly, does not fulfill its function and is, therefore, nothing more than a sham." *Id.* at 1564 (quotations omitted). The court distinguished *Duchesne* on the grounds that although a certain amount of bias on the part

of the supervisory official conducting the pre-termination hearing is constitutionally tolerable, "[i]n the case at bar, the complaint indicates that the bias was so harmful as to totally defeat the concerns and goals of the hearing." *Id.*

The court's reasoning in *Bettio* is supported by the Supreme Court's decision in *Loudermill*. In *Loudermill*, the Court explained: "Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the *discretion* of the decisionmaker is likely to be before the termination takes effect." 470 U.S. at 543, 105 S.Ct. at 1493–94 (emphasis added). In addition, the Supreme Court, in balancing the competing interests involved when a municipal employee is discharged, explained that "the pre-termination hearing . . . should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46, 105 S.Ct. at 1495. Moreover, the Court explained that the pre-termination hearing

> is one way in which providing effective notice and informal hearing permitting the [employee] to give his version of the events will provide a meaningful hedge against erroneous action. At least the [employer] will be alerted to the existence of disputes about facts and arguments about cause and effect . . . [H]is *discretion* will be more informed and we think the risk of error substantially reduced.

*Id.* at 543 n. 8, 105 S.Ct. at 1494 n. 8 (emphasis added) (quotations omitted); *accord Duchesne*, 849 F.2d at 1008 ("The limited, 'right-of-reply' pretermination hearing, as defined in *Loudermill*, is designed to invoke the employer's discretion,' his sense of fairness and mutual respect, his willingness to reconsider.").

From the foregoing, it is clear that when the evidence establishes that the outcome of a municipal employee's pre-termination hearing has been predetermined regardless of the proof presented, the concerns and goals of the pre-termination hearing as set forth in

*Loudermill* have not been met. In such cases, there is no meaningful opportunity to invoke the decision maker's discretion, and there is no possibility that a mistaken decision can be avoided.[12] In sum, such a hearing does not fulfill its function as enunciated in *Loudermill* and *Duchesne* and is, in fact, nothing more than a sham proceeding. *See Cremeans v. City of Roseville,* 861 F.2d 878, 883 (6th Cir.1988) ("[I]t cannot be said that the hearing itself was nothing more than a sham such that the pretermination hearing did not fulfill its function."). Such a proceeding, if countenanced by the Court, would eviscerate the protections afforded to municipal employees under the Due Process Clause of the Fourteenth Amendment.

■ In this case, it is clear that, because the outcome of the May 9, 1994 hearing was predetermined regardless of the proof presented, plaintiff's pre-termination hearing was a sham proceeding and did not fulfill its functions.[13] As such, Mayor Herenton, by predetermining plaintiff's pre-termination hearing, violated plaintiff's procedural due process rights. In addition, because the Mayor's actions represented a deliberate choice to follow a course of action made from among various alternatives by the official responsible for establishing final policy with respect to the subject matter in question, the City is also responsible for this violation. Defendant Winfrey, who was personally involved only in the internal appeal, is not liable for the above violation because the internal appeal was not constitutionally mandated.

### 2. *Equal Protection Claim*

Plaintiff next claims that he was denied equal protection of the laws in that he was discriminated against because of his race—specifically, plaintiff asserts that he was terminated by the Mayor because he is white. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

■ "Both Title VII[, 42 U.S.C. §§ 2000e to 2000e–16,] and section 1983 provide relief for discriminatory employment practices of public employers." *Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir.1988) (citation omitted).[14] In addition, "the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983." *Id.* (citations omitted). "Under both statutes, the plaintiff must establish by a preponderance of the evidence that [ ]he was the victim of intentional or purposeful discrimination." *Id.*

A plaintiff cannot meet this burden by simply introducing evidence of discriminatory intent and suggesting that such intent could have played a role in an adverse employment decision. Rather, a plaintiff is required to demonstrate that the adverse employment decision would not have been made but for' [his race] Put differently, the plaintiff must show that the discriminatory intent more likely than not

---

12. In this respect, a hearing in which the outcome has been predetermined regardless of the proof presented differs from a hearing in which the decision maker is biased against the employee who is facing termination. In the latter situation, there is at least a chance, albeit slight, that the decision maker's discretion can be invoked; it is this chance that distinguishes the two situations.

13. In *Duchesne,* the court also explained that the word "decision maker" refers to the official "responsible for the discharge." 849 F.2d at 1007. In this case, it is clear that Stacy was not the official responsible for plaintiff's discharge. In

this respect, even applying *Duchesne* rigidly, plaintiff was not afforded the hearing contemplated. *See id.*

14. It is clear that a party can bring a civil action under either statute. *Annis v. County of Westchester,* 36 F.3d 251, 255 (2d Cir.1994) ("We therefore hold that an employment discrimination plaintiff alleging the violation of a constitutional right may bring suit under 1983 alone, and is not required to plead concurrently a violation of Title VII."); *accord Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1079 (3d Cir.1990).

was the basis of the adverse employment action.

*Id.* (quotations omitted).

"In Title VII actions, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by the defendant." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1246 (6th Cir.1995) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). "A plaintiff may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant or by showing the existence of circumstantial evidence which creates an inference of discrimination." *Id.* (citations omitted).

■ "Where the evidence for a prima facie case consists ... of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the prima facie evidence the ultimate issue of discrimination is proved; no inference is required." *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 707 (6th Cir.1985) (quotations omitted).[15] "When direct evidence of discrimination has been introduced, the lower court must, as an initial matter, specifically state whether ... it believes plaintiff's proferred direct evidence of discrimination." *Id.* at 708. "Upon crediting the plaintiff's direct evidence, the district court finds facts requiring the conclusion that unlawful discrimination was at least a 'motivating factor' for the employer's actions. The existence of unlawful discrimination is patent, and if the employer does not propose an alternative explanation for its actions,. liability will automatically follow." *Terbovitz v. Fiscal Court of Adair County. Ky.,* 825 F.2d 111, 115 (6th Cir.1987) (citation omitted).

■ In this case, plaintiff presented credible, direct evidence of racial discrimination by Mayor Herenton—specifically, the Mayor's statements to Adair and Burgess that he wanted Wagner fired because of the pressure the Mayor was getting from the black community over the April 8, 1994 incident, and his statements on two occasions that he was elected by the black, not white, Memphis voters. Plaintiff, as a white police officer, was thus politically expendable. Mayor Herenton's statements, therefore, demonstrate that Wagner's firing was racially motivated, i.e., Mayor Herenton's decision to have Wagner terminated would not have been made but/for Wagner's race. Thus, plaintiff has proven the existence of unlawful discrimination. Accordingly, to avoid liability for damages, defendants must propose an alternative explanation for Wagner's termination.

■ As the court explained in *Terbovitz,* If the employer ... assert[s] an alternative justification for its employment action, ... it will be arguing, either explicitly or by implication, that although discriminatory motivation may have entered into its employment decision, the same decision would have been made regardless of the discrimination. At this point, the case becomes a "dual motive" or "mixed motive" case, and the crucial issue becomes one of causation. However, because discrimination has already been established by the plaintiff's direct evidence, the employer must do more than merely "articulate" its nondiscriminatory justification as required under *McDonnell Douglas.*

*Id.; accord Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).[16] At this point, "the burden shifts to the employer to prove by a preponderance of the evidence 'that the adverse employment action would have been taken

**15.** It is well settled that the *McDonnell Douglas* test and its shifting burdens are inapplicable "to cases in which the Title VII plaintiff presents credible, direct evidence of discriminatory animus." *Terbovitz v. Fiscal Court of Adair County. Ky.,* 825 F.2d 111, 114–15 (6th Cir.1987); *Blalock,* 775 F.2d at 707. "Direct evidence and the *McDonnell Douglas* formulation are simply different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent." *Id.* "Direct evidence of discrimination, if

credited by the fact finder, removes the case from *McDonnell Douglas* because the plaintiff no longer needs the inference of discrimination that arises from the prima facie case." *Terbovitz,* 825 F.2d at 115.

**16.** The Supreme Court's decision in *Price Waterhouse* was overruled in part by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.*

even in the absence of the impermissible motivation.'" *Id.* (quoting *Blalock,* 775 F.2d at 712). "Thus, once the district court accepts the plaintiff's direct evidence, the employer's asserted nondiscriminatory reason for its action effectively becomes an affirmative defense on which the employer bears the burden of proof." *Id.*[17]

■ In this case, defendants have not met their burden. Specifically, defendants did not introduce any evidence to support the proposition that Wagner would have been terminated even in the absence of the impermissible motivation, i.e., racial discrimination. In fact, the proof at trial established that Wagner had never been disciplined previously, none of the other officers involved in the incident were disciplined in any way, and there was no proof that other officers who had engaged in conduct similar to that in which Wagner was involved were terminated for their actions. In sum, defendants presented no evidence from which this Court could conclude that they have carried their burden of establishing that Wagner would have been fired even in the absence of impermissible racial discrimination. Thus, defendant Herenton, by discriminating against plaintiff because of his race, is liable for violating plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment. In addition, because the Mayor's actions represented a deliberate choice to follow a course of action made from among various alternatives by the official responsible for establishing final policy with respect to the subject matter in question, the City is also responsible for this violation. As to defendant Winfrey, it is clear that although he signed the letter that officially terminated Wagner, the decision to fire Wagner was made by Mayor Herenton. Accordingly, defendant Winfrey did not violate plaintiff's constitutional rights.

### 3. *Damages*

■ Because the Court has concluded that plaintiff has proven that his due process and equal protection rights were violated by Mayor Herenton and the City of Memphis,

the Court must now consider damages. A prevailing plaintiff in an action brought pursuant to 42 U.S.C. § 1983 may recover both actual and punitive damages. Actual damages include not only out of pocket losses such as medical expenses, lost wages, or other earnings, but also impairment of reputation, personal humiliation, and mental anguish and suffering. *Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 307, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986). Because the purpose of § 1983 damages is "to compensate persons for injuries that are caused by the deprivation of constitutional rights," *id.* (quotation omitted), Wagner may recover only those damages proximately caused by the denial of his constitutional rights on and after May 9, 1994; in particular, those damages that plaintiff associates with his pre-termination hearing and subsequent termination.

■ In this case, although Wagner suffered lost wages totaling approximately $1,300.00, this loss was not the result of defendants' conduct as it related to the pre-termination hearing or plaintiff's termination. Instead, plaintiff's suspension was the result of the violations of MPD policy and procedure as found by Deputy Director Oldham. Thus, because plaintiff presented no proof that the suspension violated his constitutional rights, plaintiff cannot recover for this loss. Plaintiff is entitled, however, to recover the legal fees he incurred for legal representation at his hearing before the Civil Service Commission, totaling $5,685.50. Accordingly, the Court awards Wagner $5,685.50 to compensate him for his out-of-pocket losses.

■ With regard to impairment of reputation, personal humiliation and mental anguish and suffering, plaintiff has proved by the preponderance of evidence that he has been substantially harmed by defendants' conduct. Director Burgess, Deputy Director Adair, Deputy Chief Stacy, and Officer Jennings each attested to the importance police officers place in maintaining a good reputation among fellow officers. As a supervisor, it is even more important for Wagner to

---

**17.** The analysis in *Terbovitz* is consistent with the Supreme Court's analysis in *Price Waterhouse.*

*Simpson v. Diversitech Gen.. Inc.,* 945 F.2d 156, 160 n. 3 (6th Cir.1991).

enjoy a good reputation. The evidence shows that following his termination, Wagner's reputation greatly deteriorated among fellow officers, particularly black officers. In addition, the fact that Wagner, a police lieutenant with 24 years experience on the force has been assigned to a position in which he rarely sees other officers further corroborates Wagner's position that his reputation within the department has been injured.

The proof further shows that Wagner suffered not only within the police department but throughout the community as well. Day after day, Wagner's story was front page news and the subject of numerous television broadcasts. Assisted by the frequent commentary of defendants Herenton and Winfrey, Lt. Wagner was labeled a racist police officer who had been fired for misconduct. Examples of the injury to Wagner's reputation in the community include his testimony pertaining to neighbors who no longer talk to him and a waitress who refused to serve him coffee at a restaurant he frequents. In sum, the evidence preponderates toward a finding that the defendants' wrongful conduct proximately resulted in substantial injury to Wagner's reputation, both within the police department and throughout the community as a whole.

Although it is difficult to quantify personal humiliation and mental anguish and suffering, the evidence in this case preponderates toward a finding that Wagner was subjected to humiliation and mental suffering following his termination from the MPD. Accordingly, the Court awards Wagner $75,000.00 for the injury to his reputation, personal humiliation, and mental anguish and suffering proximately caused by defendants' wrongful conduct.

 Although punitive damages may not be assessed against a municipality under § 1983, *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981), they may be awarded against its officials in their individual capacity. Punitive damages are designed to punish and deter officials who have engaged in egregious wrongdoing and may be assessed in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The decision to award punitive damages is discretionary. *Id.* at 54, 103 S.Ct. at 1639.

 With respect to awarding punitive damages, it is not necessary that the defendant actually derived satisfaction from hurting the plaintiff; rather, it is enough if the defendant, "while not having any particular desire to hurt the plaintiff, tramples on the plaintiff's rights, in a fashion that can fairly be called reckless, to accomplish his own aims." *Soderbeck v. Burnett County,* 752 F.2d 285, 289 (7th Cir.1985). A defendant can be said to have trampled on a plaintiff's rights when he is "shown to have engaged in plainly unlawful conduct." *Id.* at 292.

 In this case, the evidence unequivocally demonstrates that defendant Herenton recklessly trampled over Wagner's protected rights *to accomplish his own aims.* Defendant Herenton was advised on at least two occasions that he would be violating Wagner's due process rights if he summarily terminated Wagner without providing him due process of law. Nevertheless, Mayor Herenton ordered Wagner's termination. Mayor Herenton justified his conduct by claiming that Wagner was hurting his popularity in the black community and, that since black voters elected him, the white lieutenant would be fired. Thus, it is clear that Mayor Herenton engaged in plainly unlawful conduct and acted with reckless and callous indifference to Wagner's constitutionally protected rights. Accordingly, plaintiff is entitled to punitive damages against defendant Herenton. An evidentiary hearing in this matter shall be scheduled in order to determine the appropriate amount of punitive damages to be awarded.

Pursuant to 42 U.S.C. § 1988, a prevailing party is entitled to reasonable attorney's fees incurred. Accordingly, the Court awards Wagner reasonable attorney's fees in this action. Finally, costs are assessed against defendants Mayor Herenton and the City of Memphis.

## CONCLUSION

For the reasons set forth above, the Court ENTERS judgment in favor of the plaintiff against defendants Mayor W.W. Herenton and the City of Memphis in the amount of $80,685.50. In addition, plaintiff is entitled to reasonable attorney's fees and costs. As to plaintiff's claims against defendant Walter Winfrey, the Court ENTERS judgment in favor of defendant Winfrey. Finally, the Court finds that plaintiff is entitled to punitive damages against defendant Herenton. A hearing is set for Friday, July 25, 1997, at 2:00 p.m., in order to determine the amount of punitive damages to be awarded.